STATE

v.

Noroelia WILSHIRE.

No. 85–290–C.A.

Supreme Court of Rhode Island.

May 20, 1986.

Arlene Violet, Atty. Gen., Thomas Dickinson, Spec. Asst. Atty. Gen., for plaintiff.

John Tramonti, Jr., John A. MacFadyen, 3rd, Providence, for defendant.

## OPINION

WEISBERGER, Justice.

This case comes before us on the defendant's appeal from a judgment of conviction of the crime of first-degree murder entered in the Superior Court pursuant to a jury verdict rendered March 10, 1985. We affirm. The salient facts of the case are as follows.

On April 23, 1983, East Greenwich Detective Robert Lemoi received a telephone call from defendant, Noroelia Wilshire, a little after 7:30 p.m. She stated that her husband had been found dead in their garage at 1075 Middle Road, East Greenwich, Rhode Island. Detective Lemoi was an acquaintance of defendant and her deceased husband, and Mrs. Wilshire asked him to go to the scene. (At the time of the phone call, defendant was at the home of neighbors where she had gone following discovery of her husband's body.) Lemoi called the East Greenwich police headquarters and then drove to the Wilshire home to find the body. He was at first unable to do so, but then he went to the neighbors' home and talked to defendant. She provided Lemoi with more specific instructions. As a result, with the aid of a flashlight, he located the body of John Wilshire in the garage of the Wilshire home; the body was near the left-front wheel of a tan Oldsmobile Cutlass bearing license plate number NORA 7. It appeared that John Wilshire had been shot twice. No gun was found at the scene.

Other East Greenwich police officers arrived at the scene and searched the house for intruders. Their inspection of the premises disclosed that drawers had been opened and an apparent ransacking of the dwelling had taken place. These discoveries seemed to indicate that a burglary had occurred. Moreover, the wallet and jewelry John Wilshire normally had on his person were not found on the body.

It appeared, however, to the investigating officers that there had been no forced entry and that many items of value remained untouched, in spite of the apparent ransacking. Silver, jewelry, and camera equipment had not been taken by the alleged burglar. This omission caused the officers to suspect that the burglary and ransacking had been staged. They questioned defendant concerning her whereabouts. She stated that at approximately 4:50 p.m. on April 23, 1983, she, her mother, and her son went to the Midland Mall Cinema in Warwick. She stated that she drove her husband's car, an Oldsmobile 98 bearing license plate JKW. Her husband had suggested that she take this car because he did not like their son, Alex, to ride in the smaller Cutlass. She stated that they remained at the movie theater until approximately five to ten minutes past 7 p.m. when they returned and found her husband's body in the garage. She stated that she and her husband had had marital problems arising out of financial difficulties. These difficulties had been aggravated by the husband's inability to repay a loan that had been made to the Wilshires from defendant's father.

The police questioned various neighbors and learned from Glenn and Carolyn Bowgren and Marjorie Kettelle that they had seen Noroelia Wilshire leave the house in the Cutlass bearing license plate NORA 7 (not the Oldsmobile 98) at approximately 5:45 or 5:50 p.m. (when she was supposedly at the movie theater). The police also questioned Leonard Brown, the manager of the Midland Mall Cinema. He stated that he had seen defendant at the movie theater on April 23 and that she had asked several times when the movie would end. He had seen defendant and her mother outside the theater after the start of the movie several times, the last time being approximately 6 p.m. He could not say whether she stayed for the whole movie.

The East Greenwich police obtained a warrant from a Superior Court justice, pursuant to which a search of the premises was conducted on May 17, 1983. This search produced a letter from the Firearms

Division of Colt Industries congratulating someone upon the purchase of a Colt handgun and also produced a yellow tag that is ordinarily attached to such a gun to warn of the danger in handling a firearm. Ballistic evidence introduced at the trial indicated that the markings on the bullets that caused the death of John Wilshire were consistent with markings on bullets fired from a Colt handgun.

Evidence was also introduced that defendant had consulted a lawyer regarding a divorce and that she had stated that she "hated" her husband. Evidence was further introduced that a short time before the husband's death, defendant had obtained a $150,000 insurance policy on his life with the New York Life Insurance Company, for which she was an agent. A handwriting expert testified that although John Wilshire had not signed the application, defendant had signed the policy application as a witness. Moreover, the expert testified that whoever had written the signature had sought to simulate that of the deceased. Also, evidence was introduced that defendant had been spending a significant amount of time at the home of the man who was her supervisor at the insurance company. In addition, defendant had called a number of witnesses to ask them not to give any statements to the police unless her attorney was present. Medical evidence indicated that John Wilshire had died two to four hours prior to the on-the-scene physical examination that took place at approximately 9 p.m. on April 23, 1983. Thus the time of death was determined to be between 5 and 7 p.m.

On the basis of this circumstantial evidence, the jury found that the state had proven defendant's guilt beyond a reasonable doubt. The trial justice denied a motion for a new trial after an extensive review of the evidence and testimony in the case, stating, "[T]he jury was justified in finding as they did. The Court is in full agreement with their verdict, and the motion for a new trial is denied."

In support of her appeal, defendant raises five issues. These issues will be con-

sidered in the order of their significance to the court's opinion. Further facts will be supplied as necessary to consider the issues as presented.

I

## DID THE TRIAL JUSTICE ERR IN DENYING DEFENDANT'S MOTION TO DISMISS THE INDICTMENT?

The defendant moved to dismiss the indictment on the ground that the grand jury testimony of Lieutenant John Reise of the State Police was irregular and improper. The defendant argues that Lieutenant Reise and members of the grand jury engaged in a prolonged and improper colloquy concerning the reconciliation of testimony given by Leonard Brown, the manager of the Midland Mall Cinema, with that of Glenn and Carolyn Bowgren and Marjorie Kettelle concerning the times when defendant had been observed at her residence and at the theater. The defendant argues that this colloquy constituted a violation of Rule 6(d) and (e) of the Superior Court Rules of Criminal Procedure. The thrust of the argument seems to be that Lieutenant Reise in effect interfered with the deliberative process of the grand jury as opposed to testifying before it.

There is no question that this colloquy came about as a result of questions put by members of the grand jury. Lieutenant Reise was attempting to respond to those questions, relying on his knowledge of the investigation and his recollection of the statements of the various witnesses. He repeatedly stated to the grand jury that he did not know what others had testified to before the grand jury. For purposes of our analysis, we shall assume, without deciding, that this colloquy, though not in any way encouraged by counsel for the state, would have been incompetent for admission in a judicial proceeding. There is no question that Lieutenant Reise was there as a witness and that during his presentation the grand jury was not engaged in deliberations even though the colloquy may ulti-

mately have been considered by the grand jury during its deliberations.

■ This court has always recognized the broad powers of the grand jury to investigate any case that comes before it. We have also recognized that the dismissal of an indictment because of alleged misconduct or irregularity of the grand jury is an extraordinary remedy, indeed, and that such a sanction is reserved for very limited and extreme circumstances. *State v. Manocchio*, 497 A.2d 1, 12 (R.I.1985); *State v. Romano*, 456 A.2d 746, 750 (R.I.1983). We have declined to adopt a per-se rule of dismissal of an indictment for every violation of a rule of criminal procedure, such as Rule 6(e), *State v. Heredia*, 493 A.2d 831, 833–34 (R.I.1985). In our approach to determinations of motions to dismiss indictments for alleged irregularities, we have generally followed the lead taken by the Supreme Court of the United States in *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956).

In that case, Justice Black, speaking for the Court in connection with the use of hearsay evidence at a grand jury proceeding, observed:

"If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more." *Id.* at 363, 76 S.Ct. at 408–09, 100 L.Ed. at 402–03.

Recently the Supreme Court of the United States in *United States v. Mechanik*, —— U.S. ——, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986), declined to dismiss an indictment even though the simultaneous presence of two law-enforcement agents before the grand jury violated Rule 6(d) of the Federal Rules of Criminal Procedure. Justice Rehnquist, speaking for a majority of the Court, held that the societal cost of a retrial was sufficiently great that even a violation of a rule of criminal procedure would not suffice to justify the dismissal of an indictment after a guilty verdict by a petit jury had established not only that there was probable cause to believe that the defendants were guilty as charged but also that they were, in fact, guilty as charged beyond a reasonable doubt. *Id.* at ——, 106 S.Ct. at 943, 89 L.Ed.2d at 58. He went on to say, "Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt." *Id.* at ——, 106 S.Ct. at 942, 89 L.Ed.2d at 56.

■ We are of the opinion that in the case at bar any impropriety that may have occurred as a result of the colloquy between Lieutenant Reise and members of the grand jury was also harmless beyond a reasonable doubt in light of the ultimate verdict of the jury. Consequently, the trial justice did not err in declining to dismiss the indictment.

## II

DID THE TRIAL JUSTICE ERR IN DECLINING TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF THE WARRANTLESS SEARCH ON APRIL 23, 1983?

The evidence is undisputed that on April 23, 1983, defendant called Detective Robert Lemoi at approximately 7:45 p.m. Although Lemoi was a neighbor, he was known by defendant to be a police officer. Asking Lemoi to go to her house, she stated that she believed her husband was lying dead on the floor. Detective Lemoi called the East Greenwich police department and reported a possible suicide. Lemoi then

went to the house and entered the garage through an open garage door. The garage was attached to the house. At first Lemoi was unable to find the body and requested assistance from defendant, who was next door at the home of neighbors. As a result of further directions from defendant, Lemoi returned to the garage and found John Wilshire's body in a pool of blood under the front portion of the Oldsmobile Cutlass bearing license plate NORA 7.

After the officer found the body, he noted that defendant was approaching the house. Lemoi went to meet her and advised her to refrain from entering the house because her husband had been shot. She then asked Lemoi if the house had been ransacked. He responded that he did not know.

Shortly thereafter Lemoi was joined by a number of other officers from the East Greenwich police department, who made a protective search of the entire house in order to determine whether any intruders or suspects were on the premises. They observed the open drawers in various parts of the house from which contents had been removed. They retrieved bullets and other physical evidence relative to the shooting. They took a number of photographs at the scene.

After considering this largely undisputed evidence, the trial justice declined to suppress any evidence obtained in the course of this warrantless search except certain matchbook covers, which had been seized in the course of the search. The trial justice found that all other evidence was justifiably observed in plain view in the course of a protective search of the murder scene justified by the exigency of circumstances as approved by the Supreme Court of the United States in *Thompson v. Louisiana,* 469 U.S. 17, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984), and *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). This type of protective search for suspects or intruders and the observations made of objects in plain view were extensively analyzed by this court and defined in *State v. Jennings,* 461 A.2d 361 (R.I.1983).

■ Under the doctrine enunciated in the foregoing cases, there is no question that the police had a right to respond to the apparently exigent circumstances of homicide-burglary and to search the entire house for possible intruders and, in the course of such a search, to examine and seize evidence that was in plain view.

■ Moreover, in the case at bar, the undisputed evidence discloses that defendant had requested Detective Lemoi to come to the scene and to make an examination of the premises relating to her husband's death. Her question concerning the ransacking of the house clearly implied an invitation to Lemoi and to other members of his department to examine the house for evidence of a burglary. Although the trial justice made no finding on the issue of consent, we are of the opinion that the uncontradicted evidence could lead to only one conclusion on this issue, that defendant had issued both an express and a clearly implied invitation to examine the entire house to the police to determine whether a burglary had been an attendant circumstance of her husband's death. The fact that the police later determined that the "burglary" had been staged does not vitiate the invitation or the motivation of defendant for extending such an invitation.

As a consequence, this search need not be justified under the limited principles of *Thompson v. Louisiana* and *Mincey v. Arizona,* both *supra,* but under the broader principles of a consent search as explicated in *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). There was no question of the right of defendant as a coinhabitant of the dwelling to extend such consent and also no question that her consent precluded her from objecting to the admissibility of the fruits of such a search. Consequently, we are of the opinion that the trial justice may have established limitations upon the search that were unnecessary, but in any event he did not err in declining to suppress the observations of

the officers, including photographs and other evidence relating to bullets produced as a result of this consensual search.

### III

DID THE TRIAL JUSTICE ERR IN DECLINING TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF THE SEARCH CONDUCTED ON MAY 17, 1983, PURSUANT TO A WARRANT ISSUED BY A SUPERIOR COURT JUSTICE?

■ On May 17, 1983, members of the East Greenwich police department conducted a search pursuant to a warrant issued by a Superior Court justice. The warrant was issued on the basis of an affidavit that generally set forth that John Wilshire had been found dead in his home on April 23, 1983; that the home appeared to have been burglarized, but that on examination the "burglary" appeared to have been a sham; that defendant's account of her presence at the movies at the time the homicide occurred was untrue; that she had been seen by neighbors near her residence during the period when she was supposedly at the movies; that she was driving a vehicle with registration plate NORA 7 at this time rather than the vehicle with registration plate JKW (which she claimed to have driven during the entire evening); that John Wilshire's body was found lying in front of the NORA 7 vehicle; and that apparently the blood stains and tire marks indicated that this vehicle had been returned to the garage prior to the victim's death.

We are of the opinion that based upon the totality of circumstances the contents of this affidavit supplied probable cause to believe that a murder had been committed on the described premises and that the suspect had the motive and opportunity to have committed it. *See Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *State v. Ricci,* 472 A.2d 291 (R.I. 1984). Indeed, examining the totality of the circumstances as set forth in the affidavit, we find that the information supplied and the reliability of such information undoubtedly exceeded the required quantum of evidence upon which to base a finding of probable cause.

■ The defendant challenges the warrant on the ground that there was an absence of probable cause to believe that evidence of the crime of homicide would still be on the premises on or about May 16, 1983, when the affidavit was executed. It should be noted that Captain John T. Botelho in the last paragraph of his affidavit stated that the suspect Noroelia Wilshire had vacated the residence on April 30, 1983, and had since been considered a suspect in the crime of murder. This information would give rise to an inference that defendant had not been on the premises subsequent to one week after the discovery of the victim's body. Applying the deference usually accorded to a warrant, *see United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *State v. Ricci,* 472 A.2d 291 (R.I.1984); *State v. Nerney,* 110 R.I. 364, 292 A.2d 882 (1972), we are of the opinion that the issuing justice had an ample basis for drawing an inference of probability that the items specified in the warrant application and other evidence relating to the crime of homicide would be present at defendant's residence. Obviously this inference would not constitute proof beyond a reasonable doubt but would be well within the realm of probability.

■ The defendant further objects to the warrant on the ground that the theater manager's statement that he may have observed defendant at the theater at approximately 6 p.m. was not included. This is suggested by defendant to be a "sin of omission" that would trigger the principles enunciated in *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). In that case, the Supreme Court held that the validity of a warrant might be attacked upon showing that the officer who had filed the affidavit had been guilty of a deliberate falsehood in the facts stated or had acted in reckless disregard of the

truth. *Id.* at 155–56, 98 S.Ct. at 2677, 57 L.Ed.2d at 672. The Court went on to state that if the false material was essential to the establishment of probable cause, a court might then hold the warrant to be invalid. *Id.* In the case at bar, the trial justice determined that defendant had not submitted evidence adequate to support her claim of falsehood or reckless disregard of the truth. We are of the opinion that this finding was correct.

It is not the function of a police officer in preparing an affidavit in support of an application for a search warrant to analyze the evidence from a defense attorney's point of view and/or to include facts that might diminish the establishment of probable cause. In the case at bar, the facts stated in the affidavit were all true to the best of the knowledge of the affiant. It is very likely that the investigating officers did not consider the rather tentative observation of the theater manager as being equal in credibility to the observations of the neighbors. There was no obligation at that point to include exculpatory material in the circumstance of this case. *See State v. Acquisto,* 463 A.2d 122 (R.I.1983); *State v. Pemental,* 434 A.2d 932 (R.I.1981).

█ The defendant also raises an objection that this warrant was a "general warrant" because of the manner in which the materials to be sought out and seized were described. This description was as follows:

> "Guns and ammunition-slips, receipts or other documents revealing purchases on April 23, 1983, blood stained clothing or items containing dried blood, documents showing ownership/purchase or receipts of any firearms or ammunition, watches, rings and billfold belonging to the deceased, or *evidence relating to the homicide of John K. Wilshire.*" (Emphasis added.)

Before we begin our analysis of this question, it may be of value to consider what the term "general warrant" means in its historical context. Many courts have quoted James Otis in his impassioned plea against the issuance of general warrants by the Superior Court of Massachusetts in 1761. It should be noted that Otis referred to writs of assistance that were sought following the death of George II. Such writs authorized a search, without any showing of individual probable cause, of any premises suspected of containing items or goods imported without payment of customs duty. Such writs would last for the life of the monarch and six months thereafter. It should also be noted that George III reigned as King of England for sixty years. *See generally* O.M. Dickerson, *Writs of Assistance as a Cause of the Revolution* in *The Era of the American Revolution* 41 (Richard B. Morris ed. 1939); 33 Halsbury, *The Laws of England* 34 note t. (1961). Consequently, the general warrant or writ of assistance as it existed at the time of James Otis constituted an authorization to a customs officer to search any premises, dwelling, or structure which he might have suspected (without judicial determination) was a repository of goods imported without payment of custom duties.

In the case at bar, defendant argues that the phrase "evidence relating to the homicide of John K. Wilshire" is too general a description of the items to be seized and consequently transforms the document into a "general warrant." The Supreme Court of the United States in *Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), encountered a similar argument in respect to a warrant that authorized the search and seizure of "evidence of crime at this [time unknown]." The Court agreed that the Fourth Amendment required a particular description of things to be seized but construed the term "crime" in the warrant to refer only to the crime of false pretenses with respect to the sale of the land allegedly fraudulently obtained. *Id.* at 480–82, 96 S.Ct. at 2748–49, 49 L.Ed.2d at 642–43. The Court held that the relationship of the word "evidence" to this particular crime made the description sufficiently specific to meet Fourth Amendment requirements. In the case at bar, as

in *Andresen,* the description was as specific as the circumstances of the case permitted. *See State v. Ricci,* 472 A.2d at 298. Consequently, we believe that this warrant, which set forth an illustrative list of the types of evidence that would be sought and which was supported by a detailed affidavit, is a far cry from the "general warrant" of colonial times.

■ The defendant also argues that it was improper for the police to search trash bags and other repositories in which a letter from the Firearms Division of Colt Industries and a yellow cautionary tag that would ordinarily have been attached to a newly purchased Colt handgun were eventually found. We stated in *State v. Cobb,* 494 A.2d 1182 (R.I.1985), that police conducting a search pursuant to a warrant have the right to search any portion of the area to be searched that is capable of containing or concealing an object of the search. In seeking the items described in the search warrant, the police legitimately inspected the contents of trash bags since such repositories were perfectly capable of concealing evidence described in the warrant and relating to the murder of John Wilshire. Also see *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), wherein the Court has accorded similar breadth of search to the warrantless search of an automobile based upon probable cause. The question of whether the trash bags were inspected at the dwelling or afterward at the police station is not of constitutional significance.

Consequently, the trial justice did not err in declining to suppress evidence obtained as a result of the May 17 search pursuant to a warrant issued by a justice of the Superior Court.

## IV

### DID THE TRIAL JUSTICE ERR IN DENYING DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL?

■ We have stated on numerous occasions the standard to be applied by a trial justice when considering a motion for judgment of acquittal. In considering such a motion, the trial justice is to view only that evidence that the prosecution claims is capable of supporting proof beyond a reasonable doubt. Such evidence is to be considered in the light most favorable to the prosecution, and both the trial justice and this court on appeal must draw from such evidence all reasonable inferences that are consistent with the guilt of the accused. At such a juncture neither the weight of the evidence nor the credibility of witnesses is to be considered. *State v. Von Bulow,* 475 A.2d 995, 1020–21 (R.I.1984); *State v. Romano,* 456 A.2d 746, 756–57 (R.I.1983). Moreover, circumstantial and direct evidence should be given equal weight. *See Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 137–38, 99 L.Ed. 150, 166–67 (1954); *Romano,* 456 A.2d at 756–47; *State v. Roddy,* 401 A.2d 23, 32 (R.I.1979). Judged by these standards, the evidence in this case relating to defendant's motive, her opportunity to commit the crime, her presence in the vicinity of the dwelling at the time of the homicide, her driving the automobile against which the victim's body was found, the purchase of a $150,000 insurance policy on John Wilshire's life (without the benefit of his genuine signature), all taken together would give rise to a reasonable inference consistent with proof of guilt beyond a reasonable doubt. Certainly, on this state of the evidence, the trial justice did not err in denying the motion for judgment of acquittal.

## V

### DID THE TRIAL JUSTICE ERR IN ADMITTING CERTAIN ITEMS OF EVIDENCE AND REFUSING TO GIVE CAUTIONARY INSTRUCTIONS ON OTHERS?

■ We have considered defendant's arguments concerning the admissibility of evidence of a forged statement on the hus-

band's insurance application. The defendant argues that since this was evidence of a separate crime, it was by its nature extremely prejudicial. The state's answer to defendant's argument, which is based on the general statements of *State v. Colangelo*, 55 R.I. 170, 179 A. 147 (1935), is that this evidence of forgery was directly relevant to defendant's motivation for committing the crime. Regardless of our statements requiring exclusion in cases in which evidence of separate crimes is admitted solely for the purpose of showing a defendant's evil disposition and propensity to commit crimes, we do not and will not insulate a defendant from evidence directly relevant on the issue of guilt of the crime with which he or she is charged. *State v. Cline*, 122 R.I. 297, 330–31, 405 A.2d 1192, 1210 (1979). The jurors had every right to consider this evidence fully in determining the issue of guilt or innocence. Declining to give a cautionary or limiting instruction was not error.

The defendant also argues that the trial justice erred in allowing evidence to be admitted from defendant's divorce attorney concerning her consultation in respect to a domestic-relations case. This evidence was also directly relevant and was not a violation of an attorney-client privilege in respect to confidential communications. No confidential communications were disclosed.

We have considered the other errors raised by the defendant in respect to a prejudicial question by the prosecution and a cautionary instruction concerning the defendant's statement to the police and deem them to be without merit.

For the reasons stated, the defendant's appeal is denied and dismissed. The judgment of conviction is affirmed. The papers in the case may be remanded to the Superior Court.