STATE

v.

Joseph MOLLICONE, Jr.

No. 93–114–C.A.

Supreme Court of Rhode Island.

Feb. 15, 1995.

Jeffrey Pine, Atty. Gen., Lauren Sandler Zurier, Sp. Asst. Atty. Gen., Terrence P. Donnelly, Aaron L. Weisman, Asst. Attys. Gen., for plaintiff.

Robert B. Mann, Providence, for defendant.

## OPINION

WEISBERGER, Acting Chief Justice.

This case comes before us on an appeal by the defendant, Joseph Mollicone, Jr., from a judgment of conviction entered in the Superior Court on twenty-six counts of an indictment originally containing forty-seven counts. The charges upon which defendant was convicted are as follows: counts 2 through 6—embezzlement; counts 7, 8, 13, 14, 15, 17, 18, and 22—false-entry charges, group 1; counts 25, 26, 27, 28, 30, 31, 32, 33, 34, 37, and 38—false-entry charges, group 2; counts 23 and 46—conspiracy charges. The other counts were dismissed pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure except count 10, which was terminated by a judgment of acquittal by the court.

On these various charges defendant was sentenced to an aggregate total of thirty years of imprisonment. Substantial fines were imposed for each of the conspiracy counts as well as for each of the false-entry charges. We affirm the judgment of conviction. The facts of the case insofar as pertinent to this appeal are as follows.

Throughout the period in question defendant was the president of Heritage Loan & Investment Company (Heritage), a financial institution organized and existing under the provisions of chapter 20 of title 19 of the General Laws of Rhode Island. Until 1986 defendant concentrated certain efforts at the Pocasset Avenue branch of Heritage. In 1986 his father, who had been the president of Heritage for many years, died, and defendant became the president of the entire institution. For a period of time prior to and until 1990 defendant was also vice chairman of the board of directors of the Rhode Island Share and Deposit Indemnity Corporation, commonly known as RISDIC. Copious and highly technical evidence during this lengthy trial tended to show that between January 1986 and November 1990, the period covered by the five embezzlement counts, millions of dollars were diverted pursuant to orders given by defendant to his subordinates, including but not limited to the vice president, Peter Iannuccilli (Iannuccilli), to defendant's own personal use or to business ventures in which defendant had an interest.

A device known as "Joe's number" was utilized to itemize these disbursements. This number on a daily basis accounted for the disbursements ordered by defendant from bank funds to his personal use or to his diversionary investments. These diversions were of such substantial amounts as to render Heritage insolvent. On occasion there would be insufficient cash on hand to honor a customer's check.

On or about April 20, 1987, Dennis Ziroli (Ziroli), who was supervisor of banking examinations under the superintendent of the banking division of the Department of Business Regulation (DBR), was assigned to examine Heritage. Upon Ziroli's arrival at Heritage, defendant requested that the examination be postponed because of construction work at the bank.

During the period of postponement, Heritage's vice president, Iannuccilli, at defendant's order altered the books and records of Heritage to show that certain loans had been paid off, even though no moneys had been received. These loans were related either to defendant or to business ventures in which

he had a financial interest. Iannuccilli also wrote off another group of installment loans, though they had not been paid, and created ledger cards in the amount of $1.9 million in off-line loans (loans not shown on the computer). In fact these loans did not exist. The ledger cards thus created were shown by defendant to DBR examiners in the fall of 1987. Daily settlement sheets were prepared by employees at defendant's direction from which the reference to Joe's number was eliminated.

In order to improve Heritage's financial picture, defendant borrowed $3.5 million from Fleet National Bank by means of a personal loan and used the sum to purchase a $3.5 million certificate of deposit in the name of Heritage. He used the certificate as collateral for his personal loan, but only the asset side was shown on the books of Heritage.

As a result of the creation of the fictitious off-line loans, and the incorrect juggling of assets, the DBR examiners were deluded into finding that Heritage was solvent, although Ziroli found that it was in violation of a number of regulatory requirements. Ziroli testified that had he known the true state of the insolvency of Heritage in 1987, he would have closed the institution.

By June of 1990 Joe's number had reappeared on the daily cash-settlement sheets, but defendant ordered Iannuccilli to remove it because he expected another examination by RISDIC. The banking division of the DBR had planned to examine Heritage's books during the week of July 4, 1990. However, on June 29, 1990, Susan Hayes (Hayes), the associate director and superintendent of the banking division was told by Peter Nevola (Nevola), president of RISDIC, that RISDIC had begun its own examination on June 25. Hayes later learned that RISDIC had not in fact begun its own examination. After discussion with Nevola, however, she authorized RISDIC to conduct the examination instead of sending DBR examiners. She granted this permission on the condition that RISDIC give its assurance that it would keep the DBR informed of its findings and conclusions. The RISDIC examiner, Peter Wald (Wald), after experiencing much difficulty in

obtaining necessary documents, found that there was an almost $9 million shortfall even though Heritage's financial statement had reflected a loan-asset balance of approximately $24 million.

The defendant attempted to make up for the shortfall by providing Wald and the examiners with a list of loans that he had carried "in his head." This list had been created by Iannuccilli as dictated to him by defendant. These loans were fictitious.

In support of these loans Iannuccilli prepared a large number of fictitious promissory notes and loan applications. The defendant had given detailed instructions concerning the list of names to be used as borrowers, the dollar amounts, and the terms and conditions of each loan. Signatures in some instances were provided by Iannuccilli, but when he refused to sign certain loan documents, defendant assured him that he (defendant) would take care of it. The defendant delivered the documentation to Kenneth Proto (Proto), who was RISDIC's vice president in charge of examinations. Proto questioned the plausibility of some of the loans, but whenever he questioned their validity, defendant always gave assurances that the loans were perfectly legitimate.

Ziroli and another DBR examiner conducted a further examination of Heritage in October 1990. The RISDIC representatives including Proto and Wald were simultaneously conducting a parallel investigation of Heritage at this time.

The defendant resigned from RISDIC's board of directors on October 18, 1990. Two weeks later on November 1, 1990, the Department of the Attorney General informed defendant that it believed there was sufficient basis to commence a criminal investigation of the practices of Heritage. On November 7, 1990, defendant told two close friends that he was going to leave town in order to avoid going to jail. He then left the jurisdiction and proceeded to Salt Lake City, Utah, where he assumed the name of John Fazioli. Under this assumed name he posed as a successful jewelry manufacturer.

Ziroli conducted yet another examination of Heritage which lasted from December 1991 through March 1992. In the course of this examination he had occasion to review records relating to the examination of Heritage that he had conducted in 1987. Ziroli discovered records of substantial loans made to Heritage for which Heritage had recorded the loan proceeds as assets but had not recorded any corresponding liabilities to repay the loans. He had not been informed of any such loans during the 1987 examination. Ziroli also reviewed Fleet Bank's records regarding Heritage's $3.5 million certificate of deposit. It was then that he first learned that this certificate had been pledged as collateral for a $3.5 million personal loan that Fleet had made to defendant. He also determined that the $1.9 million in off-line loans represented to the DBR examiners as assets in 1987 were fictitious. Based on these discoveries Ziroli determined retrospectively that Heritage had been insolvent in 1987. He determined that as of July 31, 1987, Heritage's liabilities exceeded its assets by $7.2 million.

In the course of the December 1991 through March 1992 examination, Ziroli also determined retrospectively that the amount of Heritage's insolvency had grown to $15.2 million by August 1990. This amount consisted of approximately $13 million in fictitious loans and $2 million in over-valued assets. Ziroli concluded that the $8 million increase between 1987 and 1990 in the amount by which Heritage's liabilities exceeded its assets resulted from the diversion of $8 million from Heritage in the form of illicit payments to defendant or to entities in which defendant had a controlling interest.

The defendant returned to Rhode Island in April 1992. Subsequently, on July 13, 1992, a grand jury indicted him on forty-seven counts for his conduct in the management of Heritage. The state dismissed counts 1, 9, 11, 12, 16, 19 to 21, 24, 29, 35, 36, 39 to 45, and 47 pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure. The trial justice entered a judgment of acquittal on count 10. The jury convicted defendant of the remaining twenty-six charges on April 23, 1993.

In support of his appeal defendant raises thirteen issues. We shall consider these is-

sues in the order in which they are set forth in defendant's brief. Further facts will be supplied as may be needed in order to deal with these issues.

## I

## THE QUESTION WHETHER HERITAGE WAS A BANK

The defendant argues that the five counts relating to embezzlement should have been dismissed because these counts alleged that he had embezzled moneys from Heritage in violation of G.L.1956 (1981 Reenactment) § 11–41–11. This section declares it unlawful for an "officer, agent, or servant of any bank, savings bank or trust company * * * [to] embezzle or appropriate to his [or her] own use any moneys, goods, effects or funds of any bank, savings bank or trust company."

The defendant suggests that the key phrase is "of any bank, savings bank or trust company." He contends that he was never an officer of a bank, a savings bank, or a trust company. In sum defendant argues that Heritage was not a bank as the term is defined in § 11–41–11. Rather he suggests Heritage was merely a loan and investment company. The trial justice rejected a motion for judgment of acquittal based upon this argument on the ground that so to construe the statute would lead to an absurd result. In further support of this argument, defendant launches into a lengthy argument concerning amendments to G.L.1956 (1989 Reenactment) chapter 19 of title 19, that took place during the year 1990.

■ The short answer to this argument is that it is undisputed that Heritage was formed pursuant to chapter 20 of title 19, entitled "Loan and Investment Companies." It can also scarcely be disputed that during the period in question a critical portion of this chapter was § 19–20–27. This section reads as follows: "Loan and investment banks. Any corporation organized under the provisions of this chapter shall be considered a loan and investment bank."

In light of this plain and unambiguous statement defining a loan and investment corporation as a bank, it is unnecessary to respond to the lengthy and complex argument raised by defendant. It is equally unnecessary to comment upon the state's arguments relating to the nature of loan and investment companies or the fact that Heritage did virtually everything that a bank would be entitled to do as set forth in *Bowen for an Opinion,* 68 R.I. 200, 27 A.2d 181 (1942). The state points out that Heritage had all the powers that would be conferred upon a bank, including the power that it did not exercise, to offer checking accounts.

■ Nevertheless it is well settled in this state that when the meaning of a statute is plain and unambiguous, the task of judicial construction is at an end. *State v. Young,* 519 A.2d 587, 588 (R.I.1987); *City of Warwick v. Aptt,* 497 A.2d 721, 724 (R.I.1985); *Moore v. Rhode Island Share and Deposit Indemnity Corp.,* 495 A.2d 1003, 1004 (R.I. 1985). The language of § 19–20–27 clearly defines such institutions as Heritage as loan and investment banks. No ambiguity may be derived from this plain statement. Consequently the trial justice was clearly correct in denying defendant's motion for judgment of acquittal on the ground that Heritage was not a bank.

## II

## THE QUESTION WHETHER DEFENDANT MADE FALSE ENTRIES

General Laws 1956 (1989 Reenactment) § 19–19–1, as amended by P.L.1990, ch. 435, § 1 reads in pertinent part as follows:

"Every president * * * of any * * * loan and investment company * * * who, without authority of the directors or trustees * * * makes any false entry in any book, report, or statement of the depository, with intent * * * to deceive * * * the director of business regulation, or any agent appointed by the director to examine the affairs of that depository * * * upon conviction thereof, shall be fined * * * or be imprisoned."

Counts 7, 8, 13 to 15, 17, 18, and 22, referred to by the parties as group–1 counts, allege that defendant did make false entries

in the books and records of Heritage. The defendant argues that the trial justice erred in refusing to grant his motion for judgment of acquittal in respect to these counts on the ground that there was either no proof or insufficient proof that he actually made the false entries.

If one assumes that defendant is correct concerning the absence or insufficiency of proof that he physically made the false entries, one is presented with the question concerning whether it was sufficient for the state to prove that defendant caused the entries to be made even though the statute and the indictment respectively use the terms "makes" and "did make." Although no other Rhode Island case has dealt with this precise question, the Supreme Court of the United States did confront such a question in *United States v. Giles*, 300 U.S. 41, 57 S.Ct. 340, 81 L.Ed. 493 (1937).

In that case the defendant was charged with a violation of a federal statute that provided a penalty to any " 'officer * * * or employee of any Federal reserve bank * * * who *makes* any false entry in any book, report or statement of such Federal reserve bank.' " *Id.* at 43, 57 S.Ct. at 341, 81 L.Ed. at 494–95. There the defendant, who had been a paying and receiving teller, had withheld certain deposit slips to cover up a shortage in his account. His withholding the deposit slips caused bookkeepers to make false entries that failed to reflect the true balances of the depositors. He asked the trial court for a directed verdict on the ground that there was no evidence that he actually made any false entries. The Court rejected this argument with the following observation:

> "The word 'make' has many meanings, among them '[t]o cause to exist, appear or occur,' Webster's International Dictionary, 2nd ed. To hold the statute broad enough to include deliberate action from which a false entry by an innocent intermediary necessarily follows, gives to the words employed their fair meaning and is in accord with the evident intent of Congress. *To hold that it applies only when the accused personally writes the false entry or affirmatively directs* another so to do would emasculate the statute—defeat the very

end in view." *Id.* at 48–49, 57 S.Ct. at 344, 81 L.Ed. at 497–98. (Emphasis added.)

The Court emphasized that Congress was not seeking to punish the bookkeeper who copies items into the books but the officer who conceived of and carried out the fraudulent scheme that the false entry was designed to conceal. *Id.* at 49, 57 S.Ct. at 344, 81 L.Ed. at 498.

■ The *Giles* case bears a remarkable similarity to the case at bar. The evidence in the case, viewed in the light most favorable to the state, as would be required on a motion for judgment of acquittal, would give rise to the clear inference that the false entries were caused to be made by defendant through directions given to the employees who actually prepared the documents and made the entries. It is true that in respect to two of the counts, there was some evidence that Iannuccilli recognized defendant's signature. For purposes of this portion of the opinion, we shall assume that there was insufficient evidence to prove that defendant actually made any of these entries. We are of the opinion that a sensible interpretation of our statute as given by the United States Supreme Court to the federal statute would equate the terms "makes" and "causes to be made."

■ The defendant argues further that whereas the statutory term may include both "makes" and "causes to be made," the indictment uses the words "did make." He contends that the state is bound by its own charge. When the statute is construed as applicable to either term, the indictment or the charge may be stated in the language of the statute that sets forth the essential elements of the offense. *State v. Markarian*, 551 A.2d 1178, 1180, 1182 (R.I.1988); *State v. Jorjorian*, 82 R.I. 334, 340–41, 107 A.2d 468, 471–72 (1954). Since the state was authorized to set forth the offense exactly in statutory language, the state had the benefit of any interpretation that might properly be placed upon that language which sets forth the elements of the crime. *See United States v. Bristol*, 473 F.2d 439, 441–42 (5th Cir.1973).

*In re Fiske,* 117 R.I. 454, 367 A.2d 1069 (1977), does not compel a different result. In that case, the state alleged in a petition seeking to have a minor declared a delinquent child that the minor had committed one of a number of proscribed acts, which acts were set forth by statute in the disjunctive. The trial justice found that the minor had committed one of the acts proscribed by the statute, but not the one that he had been charged with committing. We held that when only one of the offenses set forth in a statute is charged, a defendant cannot be convicted upon proof that he or she committed one of the other proscribed acts, rather than the one charged. We explained that this is a corollary of the constitutional right to specific notice. *Id.* at 457–58, 367 A.2d at 1072.

In the case at bar, although § 19–19–1 proscribes a number of acts which are set forth in the disjunctive, the group–1 counts of the indictment allege that defendant committed only one of the proscribed acts—the making of false entries—which *is* the offense that the state sought to, and did prove. It was entitled to prove that offense in accordance with the definition of the word "makes," which as a matter of law included the words "causes to be made." Thus, defendant was convicted of the offense charged in the indictment, *not* of an uncharged offense. Consequently the trial justice was correct in denying defendant's motion for judgment of acquittal in respect to the group–1 counts.[1]

### III

### INTENT TO DECEIVE

The defendant argues that the trial justice erred in denying his motion for a judgment of acquittal in respect to both group–1 and group–2 counts. The group–2 false-entry counts allege that defendant "did direct, aid and abet Peter J. Iannuccilli * * * to make a false entry in the books and records of Heritage" (counts 25 to 28, 30 to 34, 37, and 38).

The common theme of this motion is that there was no evidence that these entries were made with an intent to deceive the bank examiners as required pursuant to § 19–19–1. Overwhelming evidence exists in this case that defendant caused and directed these false entries to be made, the fictitious loans to be generated, and the false indication of payments to be recorded in order to deceive both RISDIC and DBR examiners concerning the insolvency of Heritage.

■■■ Our rule is well settled that on a motion for judgment of acquittal, the trial justice must view the evidence in the light most favorable to the state and must draw all reasonable inferences consistent with the guilt of the accused. *State v. Gazerro,* 420 A.2d 816, 827 (R.I.1980); *State v. McGranahan,* 415 A.2d 1298, 1301 (R.I.1980); *State v. Roddy,* 401 A.2d 23, 32 (R.I.1979). This court must apply the same standard on review. *State v. Henshaw,* 557 A.2d 1204, 1206 (R.I.1989). On viewing the evidence in this case under that standard, the trial justice and we are impelled to determine that there is ample evidence to support a jury finding of an intent to deceive.

The defendant emphasizes the fact that ultimately the examiners were able to perceive that these entries were false and that the bank was in fact insolvent. Nevertheless, the evidence is clear that defendant intended to deceive and succeeded for a period of nearly three years in delaying these findings by examiners of RISDIC and the DBR. The fact that the scheme was ultimately unsuccessful does not vitiate the intent, nor does it palliate the offense.

### IV

### AGENCY BETWEEN RISDIC AND DBR

■■■ The defendant, in support of his motion for judgment of acquittal in respect to group–1 and group–2 counts, asserts that there is no evidence that during the year 1990 RISDIC was acting as an agent for the DBR. Thus, he contends, no evidence exists

---

1. In light of our assumption regarding the evidence, we need not at this point address the admissibility or inadmissibility of Iannuccilli's testimony that he recognized one of the signatures as being that of defendant (count 17). In light of our interpretation of the word "makes," it is of no consequence whether the signature was that of defendant.

that the false entries were made with intent to deceive the DBR.

The evidence presented by Hayes clearly indicates that in the spring of 1990 she chose to rely on an examination by RISDIC rather than to follow through with an intended examination by employees of the DBR, which had the power pursuant to § 19–19–1 to appoint "any agent" to examine the affairs of a depository. Hayes, as associate director of the DBR and superintendent of the banking division, clearly had the authority to appoint RISDIC examiners as DBR agents. *See* §§ 19–14–1 and 19–20–6. She deferred an examination that had been planned by the DBR during the week of July 4, 1990, on the assurance that a RISDIC examination would take place and that she would be informed of the results of that examination.

This evidence is supplemented by Wald's testimony. Wald stated that he admonished defendant in mid-July 1990 that if he did not cooperate with his examination on behalf of RISDIC, RISDIC's examiners would leave the bank and DBR employees would complete the examination.

The later examination by the DBR in October of 1990 was presumably motivated by the findings that RISDIC examiners had reported. Consequently the manifest actions by defendant intended to deceive RISDIC examiners would also establish an intent to deceive the DBR since the RISDIC examiners were acting for and on behalf of the DBR during their 1990 examination of Heritage.

V

VARIANCES BETWEEN ALLEGATIONS AND PROOF

The defendant contends that the trial justice erred in refusing to grant his motion for judgment of acquittal in respect to counts 25, 26, and 34. This contention is supported by the argument that there were variances between the allegations in these counts and the evidence presented at trial. The variances may be summarized as follows.

In respect to count 25, defendant was charged with directing, aiding and abetting Iannuccilli to make a false entry—a fictitious promissory note in the amount of $92,000 in the name of Thomas Campopiano. This spurious promissory note was introduced into evidence at the trial, but the amount stated in the note was $97,000. Count 34 charged defendant with directing, aiding and abetting Iannuccilli to make a false entry—a fictitious promissory note in the amount of $126,000 purportedly made by one Michael Loffredo. The note was introduced into evidence but was actually in the amount of $125,000. Count 26 of the indictment alleged that defendant did direct, aid and abet Iannuccilli to make a false entry—a fictitious promissory note in the amount of $27,000 in the name of John Delsesto. At trial Iannuccilli identified this promissory note and stated that he (Iannuccilli) had signed the name John Delsesto. It is clear that no person other than Iannuccilli signed this note. John Delsesto III was called as a witness and testified that he did not sign the note that purported to bear his signature.

The indictment alleged that the fictitious promissory note was in the name of John Delsesto. The state's witness who testified that he did not sign the note was John Delsesto III. The defendant appears to argue that because of this variance in names, that is, the testifying witness's name contained a Roman numeral suffix while the name in the indictment did not, that the state failed to prove the identity of the putative fictitious borrower. The defendant claims that such proof is necessary to be convicted of the charge, and therefore, his motion for judgment of acquittal with respect to this count should have been granted.

■ Although these variances existed, they were not fatal. General Laws 1956 (1981 Reenactment) § 12–12–10 clearly states that a defendant shall not be acquitted or discharged on the ground of a variance between allegation and proof or by virtue of an immaterial misnomer of a third party. Section 12–12–10 reads as follows:

"Variances of proof and immaterial mistakes.—A defendant shall not be acquitted or discharged on the ground of variance between the allegation and proof if the essential elements of the crime are correctly stated in the indictment, information or

complaint, unless the [defendant] is thereby prejudiced in his [or her] defense. [The defendant] shall not be acquitted or discharged by reason of an immaterial misnomer of a third party, by reason of an immaterial mistake in the description of the property or the ownership thereof, by reason of failure to prove unnecessary allegations in the description of the crime, or by reason of any other immaterial mistake in the indictment, information or complaint."

In the case at bar the essential elements of the crimes were set forth in counts 25, 26, and 34 of the indictment. The clerical errors in respect to the amounts of the notes and the name of one of the parties did not constitute material variances.

It should also be noted that these promissory notes were made available to defendant approximately eight months prior to trial so that no surprise would have impeded defendant in the preparation of his defense. As we stated in *State v. Markarian,* 551 A.2d at 1182, "as long as the essential elements of the crimes charged are stated in the indictment or information, a defendant's conviction may be reversed only where the variance is prejudicial to his defense." *See also State v. McKenna,* 512 A.2d 113, 114–15 (R.I.1986); *State v. McParlin,* 422 A.2d 742, 743 (R.I. 1980).

In the instant case the essential elements of a violation of § 19–19–1 were (1) the making of the false entry, (2) the knowledge that the entry was false, and (3) the intent to deceive the director of the DBR or an agent appointed by the director. These essential elements not only were alleged in the challenged counts but were proven by the evidence introduced. The numerical variances with respect to the amounts of the two promissory notes and the misnomer of the purported maker (if misnomer it was) of the third note did not constitute fatal variances in regard to any material issue.

## VI

### MULTIPLICITY OF CHARGES

The defendant argues that counts 23 and 46 are "duplicitous" since these counts allege one conspiracy in two different counts even though the conspiracy took place during a single period. The facts alleged and proven were as follows.

Count 23 charged that defendant and Iannuccilli (an unindicted co-conspirator) conspired to create $2,127,000 in fictitious promissory notes in order to deceive the director of the DBR and an agent appointed by the director to examine Heritage, in violation of G.L.1956 (1981 Reenactment) § 11–1–6 and § 19–19–1. Count 46 of the indictment charged defendant with conspiring with Iannuccilli (an unindicted co-conspirator) to make false entries in the books and records of Heritage by entering $1,000,823.88 in bogus and fictitious loan payments in Heritage's computerized loan system with the intent to deceive the director of the DBR and an agent appointed by the director to examine the affairs of Heritage, in violation of §§ 11–1–6 and 19–19–1.

In arguing that these counts are "duplicitous," defendant misapprehends the meaning of the term "duplicity." Duplicity is defined in the criminal context as "[t]he joining in a single count of two or more distinct and separate offenses." Black's Law Dictionary 503 (6th ed.1990). The defendant really challenges these allegations on the ground of multiplicity. The "[t]erm 'multiplicity' refers to the practice of charging the commission of a single offense in several counts. This practice is prohibited because [a] single wrongful act cannot furnish [a] basis for more than one criminal prosecution." *Id.* at 1016.

■ In the instant case it is obvious that these counts are not "duplicitous," since each count charges only a single offense. Moreover, the counts are not multiplicitous since each count alleges a different and distinct criminal act. The conspiracy to create the false promissory notes was separate and distinct from the conspiracy to make false entries establishing bogus payments. The sums are different; the events are different. The fact that these events occurred in such a time frame as temporally to overlap or to parallel each other does not blur the distinct nature of the offenses charged and proven. The charge of duplicity or multiplicity was no

basis for a motion for judgment of acquittal on either or both of these counts.

## VII

## LESSER INCLUDED OFFENSES

The defendant has challenged the instructions given by the trial justice to the jury at the close of the evidence on the ground that he failed to include instructions in respect to lesser included offenses. The defendant contends that §§ 11–18–1 and 11–18–6 should have been identified as lesser included offenses of § 19–19–1. Sections 11–18–1 and 11–18–6 are misdemeanors. The gist of § 11–18–1 is the prohibition against giving to "any agent, employee, servant in public or private employ, or public official any receipt, account, or other document in respect of which the principal * * * is interested, which contains any statement which is false or erroneous, or defective in any important particular, and which * * * is intended to mislead."

The gist of § 11–18–6 is a prohibition against the making of "any false statement in writing, with intent that it shall be relied upon, respecting the financial condition, or means or ability to pay, of [the maker] * * * for the purpose of procuring * * * the payment of cash, the making of a loan or credit, [or] the extension of a credit."

The portion of § 19–19–1 with which we are concerned aims to prohibit the making of false entries by an officer or employee of a bank for the purpose of deceiving the director of business regulation or its agent.

This court has defined lesser included offenses and greater offenses by the use of the inherent-relationship test. *State v. Yates,* 571 A.2d 575, 577 (R.I.1990); *State v. Dordain,* 566 A.2d 942, 947–48 (R.I.1989). We stated in *Dordain* that the inherent-relationship test, as enunciated in *United States v. Whitaker,* 447 F.2d 314, 319 (D.C.Cir.1971), requires that (1) the two crimes must relate to the protection of the same interests and (2) proof of the lesser offense generally is necessarily presented as part of the showing of the commission of the greater offense. *Dordain,* 566 A.2d at 947.

A careful reading of the three statutes shows that they are not designed to protect the same interests. Section 19–19–1, a felony offense, proscribes the making of false entries by a bank officer so as to conceal or obfuscate the internal financial condition of a bank in order to deceive the director of business regulation or bank examiners concerning the true condition of the bank. This section's prohibition of false entries is designed for the protection of the bank's depositors.

Section 11–18–1 is designed to prohibit the giving of false documents to an agent of any public or private institution designed to mislead the institution. This statute presupposes the giving of such a document by a person external to the institution. Section 11–18–6 deals with the making of a false statement by one who seeks to obtain credit or merchandise intending that the false statement be relied upon in extending credit or giving merchandise on the false belief that the maker (of the false statement) will be able to repay the loan or pay for the merchandise delivered.

Neither § 11–18–1 nor § 11–18–6 relate to the protection of the same interest as does § 19–19–1. The two misdemeanor statutes are designed to control external transmissions of false information whereas the felony statute is designed to protect the integrity of the internal records of a bank for the protection of its depositors. Moreover it would never be necessary to prove the elements of § 11–18–1 or § 11–18–6 in order to prove a violation of § 19–19–1. The two misdemeanor offenses are separate and distinct from the felony offense. Neither of the misdemeanors bears the necessary inherent relationship to the felony offense to make it a lesser included offense of the greater offense. The trial justice was correct in declining to give the requested instruction.

## VIII

## EVIDENTIARY RULINGS

The defendant has asserted that the trial justice erred in admitting Ziroli's testimony in respect to the violations he discovered in the course of his examination of Heri-

tage in 1987. The defendant argues that this testimony purported to give an opinion on a matter of law and thus would be inadmissible save for foreign law. This argument has validity but is scarcely exhaustive. Ziroli's testimony was designed to furnish background to the jurors in relation to the financial picture of Heritage. The testimony dealt with violations that defendant had promised to correct and had no direct bearing upon the charges with which defendant was accused by the pending indictment.

The technical aspect of banking and its regulations are such that it made it helpful to the jury to receive testimony from one who had expertise and experience in the field. *See* R.I.R.Evid. 702. Ziroli's testimony did not have an impact on the ultimate legal issues that were reserved to the trial justice. *See State v. Gardner,* 616 A.2d 1124, 1128 (R.I.1992); *State v. Washington,* 581 A.2d 1031, 1033 (R.I.1990). The trial justice admitted this testimony finding it to be within the scope of Ziroli's expertise and thus implicitly indicating that it would be helpful. In so doing, he committed no error.

The defendant also argues that the trial justice erred in failing to declare a mistrial based upon a question asked by the prosecutor. The context is set forth in defendant's brief:

"Q. Those entries you saw for the CD's, the savings accounts, for the loans, was that something you characterized as something you had seen in a mom and pop operation?

"A. No.

"Q. Was that 21st century fraud?

"A. Yes."

 Counsel for defendant moved to strike the question and answer. The motion was granted. The defendant then moved for declaration of a mistrial on the ground that this statement was so inflammatory as to deprive him of a fair trial. We have said in *State v. Brown,* 522 A.2d 208, 211 (R.I.1987), that a trial justice has broad discretion concerning the declaration of a mistrial and has the best opportunity to determine the effect of a remark or a question upon the jury. *See also State v. Lane,* 609 A.2d 633, 636 (R.I.

1992); *State v. Ware,* 524 A.2d 1110, 1112 (R.I.1987). We have held in *Brown,* 522 A.2d at 210–11, that a mistrial should be declared only for incurable prejudice in the event that the trial justice determines that the remark within its factual context "so inflames the passions of the jury as to prevent their calm and dispassionate examination of the evidence."

 In the case at bar the question, although improper, was not of such character as to inflame the passions of the jurors to the extent of preventing their calm and dispassionate examination of the evidence. The trial justice offered a curative instruction, which defense counsel declined. The denial of the motion for mistrial did not constitute error.

The defendant also objects to the testimony of Steven Butler, a forensic auditor, regarding the fiduciary obligations of a bank officer; to the testimony of Iannuccilli regarding the lavish lifestyle of defendant and regarding his recognition of defendant's handwriting; to the testimony of Nicholas Iuanow regarding his meeting defendant in Salt Lake City, Utah; and to the testimony of Doris Heishman concerning her relationship with defendant during his stay in Salt Lake City.

We have carefully considered these objections and have concluded that in each instance the trial justice acted well within his discretion in determining relevance, including consciousness of guilt, motivation to conceal, and the ability of a nonexpert witness to give opinion evidence to authenticate handwriting pursuant to Rule 901(b)(2) of the Rhode Island Rules of Evidence. In summary we are of the opinion that the trial justice did not err in any of his evidentiary rulings.

## IX

## PEREMPTORY CHALLENGE

The defendant raises an issue pursuant to *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), on the ground that the prosecutor peremptorily challenged a black juror. It is undisputed that the prosecutor peremptorily challenged a female

black juror whom he had earlier unsuccessfully challenged for cause. The prosecutor presented the following reasons as a race-neutral basis for his challenge.

In filling out her questionnaire, the prospective juror had made a large number of errors in spelling basic words in everyday use, including the name of the street on which she lived. Moreover, her answers to questions propounded by defense counsel indicated that she had difficulty understanding certain legal concepts, such as defendant's right to remain silent or not to present witnesses. In seeking to challenge the juror for cause, the prosecutor emphasized the need for jurors in such a case to follow and understand technical documentary evidence that would make up a great part of the state's case. The trial justice declined to sustain the challenge for cause but suggested that the prosecutor might exercise a peremptory challenge supported by the same reasons.

■ When the peremptory challenge was exercised, defendant objected on *Batson* grounds. There was no question that the *Batson* doctrine applied pursuant to *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), even though defendant was not of the same racial group as the prospective juror.

■ Under the *Batson* rule, upon an objection to a peremptory challenge on racial grounds, the trial justice must first determine whether there is a prima facie showing of race-based challenge. For purposes of this opinion we assume that the prima facie showing was made. Upon such a showing, the burden shifts to the prosecution to set forth race-neutral reasons for peremptorily challenging the prospective juror. Upon the articulation of such reasons, the ultimate burden remains with the defendant to show that the challenge was based upon purposeful racial discrimination. *See State v. Holley,* 604 A.2d 772, 777 (R.I.1992). The reasons given must establish a basis for challenge other than race. However, the challenge need not rise to the level necessary to sustain a challenge for cause. *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88; *Holley,* 604 A.2d at 778.

■ In *Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), the prosecutor challenged certain bilingual Hispanics on the ground that they might not be willing to accept the official interpreter's translation of the testimony of Spanish-speaking witnesses. *Id.* at 356–57, 111 S.Ct. at 1864–65, 114 L.Ed.2d at 403–04. Although the prosecutor's opinion might not have sustained a challenge for cause, *id.* at 362–63, 111 S.Ct. at 1868, 114 L.Ed.2d at 407–08, the trial court's finding that the prosecutor's reasons were racially or ethnically neutral was sustained as not clearly erroneous. *Id.* at 372, 111 S.Ct. at 1873, 114 L.Ed.2d at 414. The Court stated that such a finding on the part of a trial justice was entitled to be tested under the deferential clearly erroneous standard. *Id.* at 364–70, 111 S.Ct. at 1868–72, 114 L.Ed.2d at 408–13. Applying the deferential standard to the trial justice's ruling in this case, we conclude that his acceptance of the race-neutral reasons articulated by the prosecutor was certainly not clearly erroneous. The nature of the case and the volume of evidence, including financial documents, extensive records, and technical testimony from forensic experts, made the level of education and intellectual capability of a juror a significant reason for the exercise of a peremptory challenge. The defendant's argument on this issue is unavailing.

## X

## CONSTITUTIONALITY OF THE SENTENCE

■ In his brief defendant raises questions concerning the constitutionality of the sentence imposed upon him by the trial justice. However, at oral argument counsel for defendant conceded that this court will generally not consider a challenge to the sentence on direct appeal but only after defendant has filed a motion to correct or reduce the sentence pursuant to Rule 35 of the Superior Court Rules of Criminal Procedure.

Consequently this court will not consider the challenge raised at this time, without prejudice to defendant's raising these same issues if he is aggrieved by the response of

the Superior Court to a Rule 35 motion. *See State v. Brigham,* 638 A.2d 1043, 1046–47 (R.I.1994).

## XI

### BILL OF PARTICULARS

The defendant urges the court to find prejudicial error in the denial by the trial justice of his motion for a bill of particulars pursuant to Rule 7(f) of the Superior Court Rules of Criminal Procedure. The trial justice denied this motion on the grounds that the allegations set forth in the indictment, together with the discovery provided to defendant, gave defendant ample notice upon which to prepare his defense without the necessity of a bill of particulars.

■ Although Rule 7(f) is expressed in mandatory terms, we have noted in *State v. Collins,* 543 A.2d 641, 654 (R.I.1988), that "[t]he function of a bill of particulars is to provide the defendant with the factual detail omitted from an indictment or information. Its primary purpose is to supply the defendant with such particulars as are necessary in order that judicial surprise is avoided at trial."

In examining the allegations of the indictment and considering the discovery furnished to defendant by the state, the trial justice concluded that there was no necessity to supplement the allegations and discovery in order to provide substantial factual details so that judicial surprise would be avoided at the trial. Considering the specific allegations set forth in the indictment—and the discovery provided—we are of the opinion that the trial justice did not err in not granting the motion for a bill of particulars in the circumstances of this case.

## XII

### DEFENDANT'S MOTION TO COMPEL MORE SPECIFIC DISCOVERY

Prior to trial, counsel for defendant filed a motion to compel more specific discovery. In essence, defendant sought to compel the state to specify which documents it intended to introduce at trial.

The state had provided defendant with copies of the large volume of documents the state intended to introduce at trial. In addition the state provided defendant with schedules detailing defendant's individual acts of embezzlement prepared by its expert, Clifford Coutcher (Coutcher).

Also the state invited defendant and his counsel to inspect and copy documents contained in a number of boxes stored in two rooms set aside by the state for this purpose. Although the boxes were labeled with the description of their contents, the state further offered to assist counsel for the defense and defendant by providing guidance from its investigative team. The state argued in response to the motion to specify documents that defendant and his counsel had declined the invitation to peruse these documents at length and had only visited the rooms on one or two occasions.

The trial justice declined to require the state to specify the documents it intended to use at trial and relied upon the wording of Rule 16(a) of the Superior Court Rules of Criminal Procedure that requires the attorney for the state to permit defendant "to inspect * * * copy or photograph any of the following items within the possession, custody, or control of the state * * * (4) all books, papers, documents, photographs * * * or copies thereof."

■ In furnishing the material pursuant to this rule and offering defendant and his counsel the opportunity to inspect and copy documents long prior to trial, the state fulfilled its obligation. Unlike the situation in *State v. Coelho,* 454 A.2d 241 (R.I.1982), and *State v. Verlaque,* 465 A.2d 207 (R.I.1983), the state in this instance was not tardy or belated in providing this information and opportunity to defendant but did so in September 1992, well in advance of the trial, which began on March 22, 1993. In denying the motion to compel further discovery, the trial justice did not err and relied upon the plain requirements of Rule 16(a)(4).

## XIII

### MOTION TO DISMISS DUE TO GRAND JURY IRREGULARITIES

The defendant moved to dismiss the indictment on the ground that the secrecy of the

grand jury was violated by the presence of two unauthorized persons during testimony before the grand jury on March 11, 1992, and on the ground that the prohibition against the disclosure of matters occurring before the grand jury was violated by the dissemination of evidence gathered pursuant to the grand jury subpoena.

The trial justice made certain findings of fact concerning violation of Rule 6, subsections (d) and (e), of the Superior Court Rules of Criminal Procedure.

"It is not disputed that Clifford Coutcher of the Rhode Island State Bureau of Audits on loan to the Department of Attorney General and Lori Tellier, an auditor with the department, were present in the grand jury on the day and time under consideration. They each testified that they had been sworn as agents of the grand jury during the investigation of the defendant and the consideration of the evidence against him by the previous grand jury. * * * In addition, there is no dispute that during the months of investigation and presentment of evidence to the two grand juries, Coutcher was kept abreast of how matters were proceeding in the grand juries and that certain documents obtained pursuant to grand jury subpoena were made available to various other agencies upon presentment of duly authorized subpoena. On one occasion, the documents not relating to this defendant or any count in the indictment were viewed by a reporter from the print media."

The defendant points out in his brief that the trial justice declined to grant the motion to dismiss on the ground of the presence of Coutcher and Lori Tellier because the presence of these two unauthorized persons for about one hour had no effect on the grand jury process.

■ There is no question that certain documents that had been subpoenaed were shared with other agencies and that the principal investigator, Coutcher, was kept abreast of what was going on and organized and culled out for grand jury consideration those documents relevant to the investigation. The trial justice found that none of these activities resulted in any prejudice to

defendant and had no effect upon the deliberations of the grand jury. Our own examination of the record indicates no prejudicial conduct by any of the persons or agencies that were permitted to examine the documents subpoenaed for use by the grand jury. No evidence exists of any interference with the deliberations of that body. Only a per se rule of dismissal for any violation of Rule 6 could support defendant's argument in this case. We have consistently declined to adopt such a per se rule of dismissal. In fact we have consistently stated that dismissal of an indictment because of violations of Rule 6 or due to prosecutorial misconduct or pre-indictment publicity in relation to the grand jury is an extraordinary sanction reserved for very limited and extreme circumstances. *State v. Woodson,* 551 A.2d 1187, 1190 (R.I.1988); *State v. Wilshire,* 509 A.2d 444, 448 (R.I. 1986), *cert. denied,* 479 U.S. 1037, 107 S.Ct. 891, 93 L.Ed.2d 843 (1987); *State v. Romano,* 456 A.2d 746, 750 (R.I.1983). Certainly irregularities resulting in no prejudice to defendant or to the grand jury process would not constitute such an extraordinary circumstance.

■ We have further held that notwithstanding allegations of irregularity, an indictment returned by a legally constituted grand jury calls for a trial on the merits. *Woodson,* 551 A.2d at 1190; *Wilshire,* 509 A.2d at 448 (citing *Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 408–09, 100 L.Ed. 397, 402–03 (1956)). We have also followed the rule enunciated in *United States v. Mechanik,* 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986), that a "petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt." *Id.* at 70, 106 S.Ct. at 941–42, 89 L.Ed.2d at 56. As we said in *Woodson,* the defendant's conviction by a petit jury completely unaffected by any of the irregularities raised by the defendant would make the dismissal of this indict-

ment wholly inappropriate. *See Woodson,* 551 A.2d at 1191.

For the reasons stated, the defendant's appeal is denied and dismissed. The judgment of the Superior Court is hereby affirmed. The papers in the case may be remanded to the Superior Court.

LEDERBERG, J., did not participate.