STATE

v.

**Gregg MORAN et al.**

**No. 96–68–C.A.**

Supreme Court of Rhode Island.

July 25, 1997.

Aaron L. Weisman, William J. Ferland, Providence, for Plaintiff.

Catherine A. Gibran, Paula Rosin, Providence, Gerard Hugh Donley, Cranston, Edward J. Romano, John A. MacFayden / William C. Dimitri, Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG and FLANDERS, JJ.

## OPINION

FLANDERS, Justice.

We are faced here with a conflict between an accused person's right to be represented by the attorney of his choice at a criminal trial charging him with felonious misconduct and a trial justice's need for ample discretion in managing the trial process to a just conclusion without tolerating unnecessary delays. In this case, the defendant's selected trial lawyer was unavailable to begin the trial at the appointed hour because he was then in the middle of trying another case in a different jurisdiction. Accordingly, we must decide whether, in these circumstances, a trial justice's refusal to reschedule the start of a criminal trial violated the defendant's right to have the lawyer of his choice defend him. Ultimately, we conclude that it was an abuse of discretion to force the defendant to proceed to trial without his chosen trial attorney, and we therefore grant him a new trial. Additionally, for the reasons limned below, we also reverse the convictions of the remaining two defendants.

## I

### Background

On April 27, 1992, two armed, masked men shattered the usual early morning quiet at Rick's Pub (Rick's) in Central Falls when they burst into the bar; ordered the manager, her husband, and another pub employee to the floor; and threatened to kill anyone who looked at them. After rifling through the cash register, they absconded with less than $30. The state later indicted Gregg Moran, his brother, Chris, and their cousin, George Gregoire (Gregoire), on a myriad of criminal charges relating to the robbery.[1] The state believed that the Moran brothers were responsible for the stickup at Rick's and that Gregoire had driven the getaway

car. Trial, conviction, sentencing, and appeal followed in due course.

The state's case began with the testimony of Rick's manager, her husband, and her assistant, all of whom recited a grim but not unfamiliar tale. On the morning of the crime two masked marauders clad in black and wearing overcoats entered the pub. Brandishing guns and shouting instructions, they flung open the pub's door and ordered the three people present to hit the deck. One of the thieves began barking, "Don't look at me! Don't look at me or I'll kill ya!" Stunned, Rick's personnel fell silent and dropped to the floor while a robber vaulted over the bar, grabbed $30 from the cash register, and quickly egressed (with his sable sidekick in tow) without any valediction.

Because of the masks, no precise identification of the robbers was possible. The best one of the witnesses could do was to describe the taller thief as being around six foot one and pudgy and the other one as being shorter, five foot nine or ten, but equally stout. On cross-examination, however, the witness admitted telling the police that the robbers were slender and that the shorter one was only five foot six. (A police officer later testified that Gregg Moran is approximately six foot three, 220 pounds whereas Chris Moran is approximately six foot two, 190 pounds.)

Another witness (a Central Falls firefighter) picked up the story by telling the jury that he happened to be driving near Rick's when he saw two men quickly exit the building and jump into a white car. He called the police on his cellular phone and tailed the vehicle through the city streets until it parked behind a red Mustang or Capri. He said one of the men resembled Chris Moran. But he was never able to identify Chris Moran as one of the culprits.[2]

---

**1.** The indictment contained fifteen counts. For ease of reference, we have appended to this opinion a chart of the crimes charged against each defendant.

**2.** The best he could do was to say that a photograph of Chris Moran shown to him by the police resembled one of the individuals he saw fleeing the scene:

"Q And on a former occasion, what was it that you told the police the first time they asked you if you could identify the person?

"A I couldn't do this—I couldn't identify them, no.

" * * *

"Q Then later on * * * [y]ou were shown some more photographs; is that right?

A later witness said that he also spied the gun-toting bandits as they hurriedly stormed into Rick's. He told the jury that he charged the getaway car and got a fleeting look at the driver's face. But the driver pulled out an automatic weapon (a KG–99 or a TEC–9) and threatened to blow him away. Understandably, the witness quickly retreated, and the car sped away. More importantly he failed to pick out Gregoire's photograph from two photo arrays, and he never identified him in court as the driver.

Armed with rough descriptions of these masked men and their getaway car, the police played a hunch and went to the home of Gregg Moran, their former colleague. There they found a red Capri with its engine still warm. They knocked on his apartment door and told him they wanted to talk. He refused to open the door. Tensions rose. One of the officers heard what he thought was the sound of a gun's being loaded.[3] "Gregg, take it easy," another officer cajoled. "Calm down. Don't do anything stupid." Unmoved, Moran replied that he would shoot anyone who crowded him, opened his door, or rushed into his apartment. He said that there was no way they were going to take him, adding that he would never go to prison.

About thirty minutes passed. Two additional Moran brothers (one of whom was a sergeant in the Central Falls police department), hied to the scene. After hashing things out, Gregg said he would give himself up, but he wanted time to regroup. While waiting, the police heard a radio blaring, water running, cloth ripping, and a toilet flushing. Gregg then unlocked the door. Chris was with him. The police seized several weapons. Returning later that day with a search warrant, the police discovered, inter alia, a TEC–9 gun case, pieces of cloth stuffed inside the stovepipe and in the chimney, and rubber gloves in the Capri. (An officer testified that Gregg used this type of glove while working as a mechanic.) Later, virtually on the eve of trial, the police found a TEC–9 gun in Gregg's new apartment.

A hair and fiber expert told the jury that tests showed that the clothes the Moran brothers were wearing when they surrendered had traces of material on them with the same microscopic properties as the pieces of cloth discovered in the chimney. He also said that the cloth pieces were consistent with materials used to make trench coats. Finally, a fingerprint expert linked two latent prints discovered on the exterior of the getaway car to Gregoire. It is significant that he could not say how long the prints had been on the car.

## II

### Analysis

#### A. *Gregg Moran's Appeal*

#### 1. **Counsel of Choice**

Gregg Moran's appeal focuses principally on the trial justice's decision to deny his motion for a continuance to permit his counsel of choice to defend him at trial. Having evaluated the facts and circumstances of this case, we believe the denial of Gregg's motion constituted reversible error.

#### a. *Setting the Stage*

Gregg engaged Richard M. Egbert (Egbert), a Massachusetts attorney, to defend

---

"A   Yes.
"Q   And when you looked at the person, you said, 'He fits the general—I'm sorry, I can only say that the general description matches, the general description'?
"A   Right.
"Q   Right? And you said you cannot positively identify anyone?
"A   Right.
"*   *   *
"Q   And all you can say is that the person in the photograph fits the general description of the person that you observed?
"A   That's correct."
But when push came to shove, he could not say that the person was Chris Moran:

"Q   But you wouldn't want to tell this jury that it was Chris Moran, would you?
"A   No, I couldn't do that."

**3.** He admitted on cross-examination, however, that the noise could have been caused by a gun being *un*loaded. Although no one testified to hearing the same sound a second time, the weapons found in Gregg Moran's apartment were all empty. However, the police ordered Moran to empty all guns as a condition of his surrender. Moreover, the blasting of the radio and the flushing of the toilet immediately preceding Moran's surrender could well have muffled any sounds attributable to weapons' being unloaded.

him against felony charges that, if proven, could result in his imprisonment for a good portion of the rest of his life.[4] Egbert first appeared at Gregg's bail hearing, and he was allowed by the court to enter his appearance pro hac vice at the arraignment. Egbert then selected a Rhode Island attorney, Edward J. Romano (Romano), to serve as local counsel. *See* Super. R.Crim. P. 50(c).[5] The countdown toward trial began at the latest in June 1992 when defendants were indicted. Pretrial conferences were set for November 14, 1994. On November 7, however, Egbert was reached for trial in a complex cocaine-trafficking case in the Federal District Court for the District of Massachusetts. *See generally United States v. Houlihan,* 887 F.Supp. 352 (D.Mass.1995). Egbert thought it would probably last about eleven to twelve weeks. On November 10, three weeks before the Rick's Pub robbery trial began and four days before the pretrial conferences were to commence, Gregg moved for a continuance until Egbert could be available to defend him. Neither the state nor any of the remaining defendants objected.

Both the defense and the trial justice acknowledged that this case had been kicking around the court system for a number of years. And the trial justice agreed that if Egbert had been a Rhode Island attorney, he would have had no choice but to grant the requested continuance. He noted the relatively hoary status of the case, the other defendants' right to a speedy trial, and the sometimes vexing problem of trying to assemble a number of busy trial lawyers at the same time and in the same place for whatever period would be needed to conduct the trial. But in denying the motion, the trial justice apparently hung his hat on Rule 50(c)'s admonition that local counsel "shall be prepared to continue with the proceeding, hearing or trial in the absence of [pro hac vice] counsel." [6]

When the trial justice refused to relent and allow the requested continuance, Romano, a lawyer whose legal practice (according to his client) concentrated on appellate and research work, hired Russell Sollitto (Sollitto) as Gregg Moran's substitute trial lawyer, and Sollitto entered his appearance the following Monday. Sollitto told the trial justice that Gregg Moran still wanted Egbert to represent him. But the trial justice was unmoved by this plea and ordered the trial to

---

4. *See, e.g.,* G.L.1956 § 11–39–1(a) ("[e]very person who shall commit robbery by use of a dangerous weapon * * * shall be guilty of first degree robbery and shall be imprisoned for not less than ten (10) years and may be imprisoned for life or fined not more than fifteen thousand dollars ($15,000), or both").

5. Rule 50(c) of the Superior Court Rules of Criminal Procedure provides in pertinent part that

"[n]o person, who is not an attorney and counsellor of the Supreme Court of the State of Rhode Island, shall be permitted to act as attorney or counsellor for any defendant in any proceeding, hearing or trial in the Superior Court unless granted leave to do so by the Superior Court. *Any attorney* who is *granted* such *leave to practice before the Superior Court shall not engage in any* proceeding, hearing or *trial* therein *unless there is present in the courtroom for the duration of the* proceeding, hearing or *trial a member of the bar of Rhode Island who shall be prepared to continue with the* proceeding, hearing or *trial in the absence of counsel who has been so granted leave.*

" * * *

"Leave shall be granted by the Superior Court in its discretion upon motion in the form approved by the court, signed by the movant and assented to by the defendant being represented and by Rhode Island associate trial counsel." (Emphases added.)

6. "You see," the trial justice told Romano, "all that counts is that there is local counsel. You are local counsel. The other attorney who is permitted to come in here on the form, it specifically says if he's not able to be here, that's it. You're local counsel. That's what it is." Gregg Moran tried to stave off the inevitable. "The main problem here," Moran said to the trial justice,

"is, I didn't retain Eddie Romano, in all due respect. I didn't retain him as primary counsel. The five brothers got together and retained Mr. Egbert. All our savings and everything else, has been put into this. * * * [T]hese are serious charges. I'm facing 20 years or better. I have a four-year-old.
" * * *

"[M]y son depends on me, and this is the only thing I have to go on. There's an attorney I've studied with, going back and forth with, and had meetings. All of a sudden, you're going to subject me, there's no disrespect to Mr. Romano, you're going to subject me to someone who is an appellate writ[er]—his forte is writing, not argument. I'm going to be subjected to have him as my primary attorney, my life, facing 20 or more, Your Honor."

begin without Egbert's being present.[7] Jury selection, trial, and convictions of all defendants soon followed.

### b. *Guiding Principles*

■ We have recognized that an accused's right to select his or her own attorney to defend against criminal charges has a central role in our adversary system of justice. *See State v. Dias*, 118 R.I. 499, 502, 374 A.2d 1028, 1029 (1977); *see also United States v. Laura*, 607 F.2d 52, 56, 57 (3d Cir.1979) (in noting that the "most important decision a defendant makes in shaping his defense is his selection of an attorney," the court commented that (1) "[a]ttorneys are not fungible, as are eggs, apples and oranges[;]" they "may differ as to their trial strategy, their oratory style, or the importance they give to particular legal issues" and (2) the defendant's ability to select an attorney allows "him to choose an individual in whom he has confidence[;][w]ith this choice, the intimacy and confidentiality which are important to an effective attorney-client relationship can be nurtured"). Although a criminal defendant's right to the attorney of his or her choice is not absolute, it does command a presumption in favor of its being honored. *See, e.g., Wheat v. United States*, 486 U.S. 153, 164, 108 S.Ct. 1692, 1700, 100 L.Ed.2d 140, 152 (1988). The trial justice must therefore "steer clear of the Scylla and Charbdis [*sic*] of extremes. At one extreme, 'a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to counsel an empty formality.' At the opposite extreme, 'it is not every denial of a request for more time'" that violates the right to counsel of choice. *Gandy v. Alabama*, 569 F.2d 1318, 1322–23 (5th Cir.1978).

■ Admittedly the decision to grant a trial continuance is usually one that is committed to the sound discretion of the trial justice. *See, e.g., State v. Bleau*, 668 A.2d 642, 645 (R.I.1995); *State v. Kennedy*, 586 A.2d 1089, 1091 (R.I.1991). But discretion can be abused. *See State v. Farman*, 600 A.2d 726 (R.I.1992). A sustainable exercise of discretion in this context requires the trial justice to balance carefully the presumption in favor of the defendant's right to trial counsel of choice and the public's interest in the prompt, effective, and efficient administration of justice. *See id.* at 728; *see also United States v. Burton*, 584 F.2d 485, 489–90 (D.C.Cir.1978) ("stripping away the opportunity to prepare for trial is tantamount to denying altogether the assistance of counsel," adding that "[t]he condition of most criminal dockets demands reasonably prompt disposition of cases; when cases are set far in advance for a day certain, an unreasonable delay in one case only serves to delay other cases, and this carries the potential for prejudice to the rights of other defendants"); *Gandy*, 569 F.2d at 1323 ("[t]he right to choose counsel may not be subverted to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice[;][i]t is a right and a proper tool of the defendant; it cannot be used merely as a manipulative monkey wrench").

Moreover, a dawdling defendant need not be rewarded with additional time once he or she has frittered away his or her fair opportunity to proceed to trial with counsel of choice. *See Bleau*, 668 A.2d at 646; *Kennedy*, 586 A.2d at 1091. On the other hand, the wheels of justice cannot churn so fast that a defendant's constitutional right to counsel of choice turns to butter. *See Gandy*, 569 F.2d at 1322; *see also Farman*, 600 A.2d at 728 (although noting that the trial justice's "commendable desire" to move a case along must be balanced against the defendant's right "to be represented by counsel in whom he had a reasonable degree of confidence," the court held that the balance there should tip "in favor of defendant's right to a reasonably prepared attorney in whom he had confidence and with whom he had at least a working relationship").

■ Given these countervailing considerations, it follows ineluctably that each case must turn on its own circumstances. *See,*

---

7. The trial justice said that he had "every confidence[,] Mr. Sollitto, that every one of the defense attorneys seated at counsel table is as good and as effective as Mr. Egbert, and if I didn't have that belief, I would continue this case and wait for Mr. Egbert, but I see no reason to do that."

*e.g., Gandy,* 569 F.2d at 1324. Some of the factors to be weighed in the balance include the promptness of the continuance motion and the length of time requested; the age and intricacy of the case; the inconvenience to the parties, witnesses, jurors, counsel, and the court; whether the request appears to be legitimate or merely contrived foot dragging; whether the defendant contributed to the circumstances giving rise to the request; whether the defendant in fact has other competent and prepared trial counsel ready to pinch-hit; whether there are multiple codefendants, making calendar control more difficult than usual; and any other relevant factor made manifest by the record. *See, e.g., United States v. Mendoza–Salgado,* 964 F.2d 993, 1015 (10th Cir.1992) (adding that courts may consider whether the "other competent counsel" was hired "as lead or associate counsel"); *Gandy,* 569 F.2d at 1324.[8]

c. *Application*

■ Moving from the general to the specific, we are persuaded that an even-handed application of the above-listed factors to the circumstances here warrants the conclusion that Gregg Moran's motion for a trial continuance should have been granted. First, the motion was timely filed; the affected defendant did not wait to move for a continuance until the very last minute before trial or, even worse, until the trial was already under way. *Cf. State v. Ashness,* 461 A.2d 659, 664 (R.I.1983) (noting, inter alia, that since defendant waited until the start of trial to request a continuance, "the necessity for the efficient and effective administration of criminal justice outweighed [his] interest in securing counsel of his choice"). Second, his requested delay appeared to be for legitimate reasons rather than merely a defense stratagem designed to postpone or avoid the day of reckoning. Third, the local counsel, Romano, had not been retained by Gregg Moran to serve as his substitute trial lawyer, nor did

he appear to have the experience or the relationship with the client that would be needed to do so. Rather, he had been hired by Egbert to assist him with the legal research and with such other contributory tasks as might have been required for Egbert to prepare for and conduct the trial. Thus, although Rule 50(c) required Romano to be "prepared to continue" with the trial in the absence of pro hac vice counsel, he did not appear in fact to be so prepared, and most critically, he did not share Egbert's designation as defendant's chosen trial counsel. Moreover, the last-minute stand-in trial counsel, Sollitto, had precious little time to prepare. *Cf. Farman,* 600 A.2d at 728 (in balancing "the need for an expeditious trial against the quality of the preparation of this case by the second and the third attorneys," the scale should tip "in favor of defendant's right to a reasonably prepared attorney in whom he had confidence and with whom he had at least a working relationship").

■ To be sure, the Rick's Pub robbery case had been pending for quite some time when the trial justice had to decide the continuance motion. And assembling busy counsel representing multiple defendants for a lengthy trial of this nature is rarely, if ever, an easy task. Added to these concerns was the speedy-trial motion previously filed by Gregoire and granted by another Superior Court justice. But even to the trial justice none of these counterbalancing factors (whether considered alone or in the aggregate) outweighed Gregg Moran's right to be represented at trial by counsel of his choice—if only Massachusetts attorney Egbert had been a member of the Rhode Island bar. But because he was not, the motion was denied when it otherwise would have been granted. Primarily for this reason, and because Rule 50(c) should not be interpreted to supersede or compromise the presumption in favor of honoring a defendant's counsel of

---

**8.** *See also United States v. Burton,* 584 F.2d 485, 491–92 (D.C.Cir.1978):

"How the balance operates to obtain a result must depend on the circumstances of the particular case. For example, a long delay and a great deal of inconvenience may be tolerated if defendant's only counsel is suddenly lost by

some unforeseen circumstance in a very complex case. However, only a slight inconvenience or delay may be sufficient grounds for rejecting defendant's request for a continuance to enable him to retain an additional counsel in a simple case where he has already retained three or four other attorneys."

choice,[9] we hold that the trial justice abused his discretion in denying the continuance motion.

We also observe that a trial justice has substantially more practical control over a lawyer like Egbert, who has and continues to represent a number of clients in Rhode Island, than he or she would have with an out-of-state lawyer who only appears here once in a blue moon and thus may have no strong personal or professional interest to protect in adhering to the court's scheduling orders. Moreover, as indicated previously, there is no evidence to suggest that the reason for the requested continuance was anything other than what was represented to the trial justice, namely, that Egbert was in the middle of trying another case.

Most tellingly, less constitutionally drastic options were available to the trial justice other than the one he selected. If the trial justice did not wish to jeopardize the other defendant's right to a speedy trial, he could have severed Gregg Moran's trial until his counsel of choice was available and proceeded to try the case against the remaining defendants. Alternatively he could have continued the case to a date certain when Egbert's present trial would likely be over and then reevaluate his options vis-à-vis each defendant on that date. Instead, he took the constitutionally least desirable course when he forced Gregg Moran to trial with a lawyer other than the one he had selected for this purpose and with one who, to boot, had an inadequate opportunity to prepare for the trial. For these reasons we conclude that Gregg Moran should be given a new trial.

## 2. Judgment of Acquittal

■ Contending that there was no evidence that he aimed a loaded gun at the police during the apartment fracas, Gregg Moran also claims the trial justice should have granted his judgment-of-acquittal motion on counts 11 through 13 (charging him with the deadly weapon assault of three officers). Moran forthrightly concedes that this argument was not advanced in the lower court. And since it does not concern a novel rule of law reasonably unknown to defense counsel at the time of trial, we deem it waived. *Compare State v. Jeremiah*, 546 A.2d 183, 186 (R.I.1988) (noting the well-established rule that " '[t]o constitute an assault with a dangerous weapon it is necessary that the weapon should be presented at the party intended to be assaulted, within the distance at which it may do execution' ") *with State v. Cardoza*, 649 A.2d 745, 748 (R.I.1994) (discussing a long line of cases holding that an issue not raised below is waived on appeal unless, inter alia, it concerns a claim so novel that its legal basis was not reasonably available to counsel at the time of trial).[10]

### B. *Chris Moran's Appeal*

Chris Moran attacks his conviction on many fronts. The crux of his complaint is that the state failed to link him to the Rick's Pub robbery in any meaningful way and that the trial justice therefore erred in not granting his motion for judgment of acquittal. We conclude that this contention has merit.

■ The controlling legal standard is familiar. When considering a judgment-of-acquittal motion, we, like the trial justice, are not concerned with the weight of the evidence or the credibility of witnesses. *E.g., State v. Smith*, 662 A.2d 1171, 1176–77 (R.I. 1995). Rather we view only that evidence

9. Rule 50(c) speaks to the attorney who has been engaged to serve as local counsel and to how prepared he or she must be to proceed with the trial or other legal proceedings if pro hac vice counsel is unavoidably absent. Its purpose is to limit the damage caused if the defendant's counsel of choice cannot be present for any reason. But it should not be construed or applied in such a fashion as to undermine the presumption in favor of honoring a defendant's selected trial counsel. Indeed, the rule does not even purport to address the circumstances in which a defendant's right to counsel of his or her choice can be overridden by other pertinent considerations, such as the trial justice's duty to manage the trial to a just and speedy conclusion. Thus, even if Gregg Moran's local or substitute trial counsel had been fully capable and prepared to defend him at trial in Egbert's absence, this fact alone ordinarily would be insufficient to supersede the right of a criminal defendant to be defended by his counsel of choice.

10. Given our disposition, we do not reach and therefore express no opinion on the merits of any of the other arguments raised by Gregg Moran.

that the state claims is capable of supporting guilt beyond a reasonable doubt, drawing from the record all reasonable inferences consistent with the guilt of the accused. *E.g., State v. Harrington*, 689 A.2d 399, 402 (R.I.1997). The motion should be granted if the evidence so scrutinized fails to establish the accused's guilt beyond a reasonable doubt. *E.g., State v. Mastracchio*, 612 A.2d 698, 706 (R.I.1992). With these legal lamps to light our analysis, we wend our way down the factual path before us.

The only colorable evidence presented by the state to link Chris Moran to the holdup consisted of (1) a witness's culling Chris's snapshot out of an array of photos as one that matched the general description of a robber he saw, (2) Chris's presence during the apartment standoff, and (3) the microscopic fibers on his clothes that were similar to the shredded material stashed in the chimney. The state claims this evidence forged an inferential chain sufficient beyond a reasonable doubt to inculpate him in the robbery. We disagree.

■ A criminal conviction may rest entirely upon circumstantial evidence. *E.g., In re Derek*, 448 A.2d 765, 768 (R.I.1982). But the conviction can stand only if the facts and circumstances considered as a whole constitute proof beyond a reasonable doubt. *Id.*; *see also State v. Dame*, 560 A.2d 330, 334 (R.I.1989) (circumstantial evidence "will be found insufficient if it merely raises a suspicion or inference of guilt"). The state, of course, has the burden of establishing identity beyond a reasonable doubt. *E.g., State v. Maxie*, 554 A.2d 1028, 1030 (R.I.1989). Measured against these benchmarks, we conclude that the evidence presented to the jury was insufficient to prove Chris Moran's connection to the robbery beyond a reasonable doubt.

The state failed to produce any witnesses who could identify Chris as one of the holdup men responsible for the Rick's Pub robbery. A witness did pick Chris's photo out of an array as one matching a "general descrip-

tion" of the robber he saw. But he told the police (and later the jury) that he could not positively identify Chris as one of the two bar thieves. And Chris's presence during the apartment standoff does not prove that he was present during the pub's pilfering or in the getaway car. He could have been at Gregg's apartment all night. Or he could have simply arrived there shortly before the police converged on the scene. In any event nary a peep came from him during the police confrontation with Gregg. Nor can the state point to the fiber evidence to make its robbery case against Chris for it is also plausible that he was just standing nearby (or even assisting his brother) while Gregg was shredding the black overcoat he supposedly had worn during the robbery.[11] Because the evidence adduced by the state failed to establish Chris Moran's involvement in the robbery beyond a reasonable doubt, we are of the opinion that his judgment-of-acquittal motion should have been granted.

### C.  *Gregoire's Appeal*

■ Gregoire also challenges, inter alia, the denial of his judgment-of-acquittal motion. Like Chris Moran, Gregoire claims that all the facts and circumstances necessary to prove the crimes charged against him had not been established beyond a reasonable doubt. The state strives to convince us that the impression of Gregoire's fingerprints on the getaway car is powerful evidence that he must have been involved with the Morans as the getaway driver. But the long and the short of it is that Gregoire may have innocently left his prints there either before or after the robbery. *Cf. State v. Payne*, 186 Conn. 179, 440 A.2d 280, 282 (1982) (noting that "[u]nless it can be shown that the circumstances are such that the fingerprints could have been impressed only at the time the crime was perpetrated, the presence of the defendant's fingerprints [on the car] does not establish his connection with the crime charged," and since "[t]he state was unable to present any evidence dating the defendant's fingerprints or otherwise limiting [the

---

11. It is significant that the forensic-fiber evidence did not indicate that more than one black trench coat had been shredded in the apartment, nor did it otherwise do anything to diminish the

possibility that Chris Moran was merely present in the apartment during the destruction of the clothing but not during the robbery itself.

timing of] their impression to the circumstances of the crime," a judgment of acquittal was in order); *Commonwealth v. Morris,* 422 Mass. 254, 662 N.E.2d 683, 685 (1996) (noting that the prosecution "must prove beyond a reasonable doubt that the fingerprint was placed there during the crime"). No prints were found inside the car. And the expert could not say how long the exterior prints had been on the car. (He did say that such prints could last for several years.) Because the fingerprint evidence on the trunk of the car was insufficient to establish beyond a reasonable doubt that Gregoire drove the getaway car, his judgment-of-acquittal motion should have been granted.

## III

### Conclusion

For these reasons we reverse the defendants' judgments of conviction and remand for a new trial for Gregg Moran and for entry of judgments of acquittal for Chris Moran and George Gregoire.

BOURCIER and GOLDBERG, JJ., did not participate.

## APPENDIX

A "√" indicates that a defendant was charged with the corresponding count.

| Counts | | G. Moran | C. Moran | G. Gregoire |
|---|---|---|---|---|
| 1 | Assault with Intent to Commit Robbery | √ | √ | √ |
| 2 | First-Degree Robbery | √ | √ | √ |
| 3 | Conspiracy to Commit First-Degree Robbery | √ | √ | √ |
| 4 | Assault with a Dangerous Weapon | √ | √ | |
| 5 | Possession of Stolen Vehicle | √ | √ | √ |
| 6 | Assault with a Dangerous Weapon | | | √ |
| 7 | Fraudulent Receipt of Stolen Goods | √ | √† | |
| 8* | Carrying a Pistol without a License | √ | | |
| 9* | Carrying a Pistol without a License | | √ | |
| 10* | Carrying a Pistol without a License | | | √ |
| 11 | Assault with a Dangerous Weapon | √ | | |
| 12 | Assault with a Dangerous Weapon | √ | | |
| 13 | Assault with a Dangerous Weapon | √ | | |
| 14 | Carrying a Firearm after a Conviction of a Crime of Violence | | | √ |
| 15 | Operating a Motor Vehicle in an Attempt to Elude Police | | | √ |

\*   Counts 8 through 10 were dismissed before trial. See Super.R.Crim.P. 48(a).

†   Count 7 was dismissed pursuant to Chris Moran's judgment-of-acquittal motion.