**STATE**

v.

**Junis BROWN.**

No. 99–325–C.A.

Supreme Court of Rhode Island.

June 13, 2002.

Virginia M. McGinn, Providence, for Plaintiff.

Paula Rosin, Providence, for Defendant.

Present: WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

BOURCIER, Justice.

In this case, the defendant, Junis Brown,[1] appeals from his conviction for first-degree robbery and the denial of his motion for a new trial based on newly discovered evidence. For the reasons set out below, we deny and dismiss his appeal and affirm his conviction.

### Facts and Travel

On the morning of August 6, 1996, Marcelino Cepeda (Cepeda) had just opened his convenience store on Prairie Avenue in Providence when a man came in and purchased a can of soda. Cepeda, whose store generally was open from 8 a.m. to 9 p.m. every day, worked behind the counter.[2] After buying the soda, the customer, whom Cepeda described as a light-skinned black man between eighteen and twenty-four years old who had short blonde hair and was about five feet seven inches tall or a bit shorter, left the store. He then returned, stood in front of the ice cream freezer, and asked for a cigar. Cepeda, who sold Philly blunt cigars, kept the boxes filled with cigars on shelves behind the counter. When the boxes were empty he put cash in them and stored them on the

floor behind the ice cream freezer. The cigar boxes were never kept on the counter, and customers did not have access to the area where the boxes were kept.

When Cepeda turned around to get a cigar, a second man entered the store, pointed a gun at him, and told him "this was a hold-up." Cepeda described the second man as being taller and darker than the first man, weighing between 150 and 175 pounds and having short hair and a small mustache. After the second man came in, the first man also took out a gun and pointed it at Cepeda.

The second man came around the counter, put a white handkerchief around his face, held a gun up against Cepeda's head, and ordered him to open the drawer of the cash register. The second man then took the money and food stamps from the drawer, yanked a gold necklace from Cepeda's neck, and took his wallet from his pants pocket. The second man then punched Cepeda on his ear and hit him in the mouth with his gun. Cepeda fell down from the second blow, bleeding from his nose and mouth. The second man then went through the cigar boxes behind the counter, one of which contained cash. He took the cash from the cigar box as well as a plastic container of coins, and he and the first man ran out of the store.

Detective Roy Persson (Det. Persson) of the Providence Police Department Bureau of Criminal Identification responded to the robbery scene. Upon his arrival, he observed a teary-eyed Cepeda with a split lip

1. The defendant's real name, as listed on his birth certificate, is "Kiplagott Stewart." The defendant was using the alias "Junis Brown" at the time of his arrest and consequently was charged under that name, with "Kip Stewart" designated as an alias.

2. Cepeda testified at trial, through a Spanish interpreter, that when he had to leave the counter he would close the store and that although his wife occasionally helped him behind the counter, he never left her alone in the store. He testified that his teenage son occasionally helped him in the store but did not work behind the counter.

holding an ice bag to his face. He also noted that there was blood on the floor behind the cash register. Detective Persson took the plastic liner of the cash register as well as five cigar boxes from the floor on the clerk's side of the counter back to the police station for fingerprint analysis.

Detective Persson found two fingerprints and a palm print on the cash register liner. Both of the fingerprints belonged to Cepeda, and the palm print was unidentifiable. There also were six fingerprints on the cigar boxes taken from the store. Only one of the prints was identifiable, and it belonged to the defendant. The fingerprint matched that of Junis Brown (defendant) with twenty-two points of comparison, "more than three times the amount needed for an identification," as noted by Det. Persson. Junis Brown later was indicted and charged with robbery of Cepeda. In late February-early March 1999, he was tried before a Superior Court trial jury.

At the close of the prosecution's case, the defendant moved for a judgment of acquittal. His motion was denied. The defendant then presented in his defense the testimony of Det. James Marsland (Det. Marsland) of the Providence Police Department. Detective Marsland testified that two days after the incident he interviewed Cepeda and took a statement from him. While taking Cepeda's statement, Det. Marsland showed Cepeda twelve photographs, including one of the defendant. Cepeda was unable to identify the defendant from the group of photographs, but Det. Marsland was uncertain when the photograph of the defendant had been taken. The defense rested following Det. Marsland's brief testimony.

On March 2, 1999, the trial jury convicted Junis Brown of first-degree robbery.[3] His motion for a new trial later was denied. On April 12, 1999, he was sentenced to a term of twenty years, thirteen of which were to be served at the Adult Correctional Institutions (ACI) and the remaining seven years were suspended with probation. The defendant timely filed his notice of appeal. While the appeal was pending, he moved here in this Court to remand the case to the Superior Court for hearing on his renewed motion for a new trial based on what he claimed to be newly discovered evidence. This Court remanded the case to the Superior Court for that hearing.

Hearing on the renewed motion for a new trial was held on various dates in February, March, and April 2000. At these hearings, numerous witnesses were called to testify on the defendant's behalf. At the conclusion of the hearing, the trial justice found that none of the evidence that had been presented was newly discovered, and the motion was denied on June 15, 2000. The defendant once again timely appealed.

In his appeal, the defendant raises four issues. First, he claims that the trial justice erred by expressing what he contends was the trial justice's personal conclusion drawn from the trial evidence in responding to a question from the jury during its deliberations. Second, the defendant alleges that the trial justice erred by failing to give the jury the defendant's requested jury charge. Third, the defendant asserts that his motion for judgment of acquittal made at the close of the state's case should have been granted because the only evidence linking him to the crime was not

**3.** The second count of the indictment, conspiracy to rob, was dismissed before trial because no other defendant was charged.

legally sufficient to support a verdict of guilty beyond a reasonable doubt. Finally, the defendant alleges that the trial justice erred in denying his renewed motion for a new trial based on newly discovered evidence.

## Analysis

### I

### Trial Justice's Response to Jury Question During Deliberations

The defendant contends that the trial justice erred by offering the jury his own interpretation of a particular trial witness's testimony. After deliberating for several hours, the trial jury foreperson sent a note to the trial justice requesting a definition of what was meant by the term "unidentifiable print." The jury's note asked whether the term meant "not enough points to make the print identifiable or does it mean the print is valid but cannot be linked to a specific person?" In response to this request, the trial justice had the court stenographer read back two portions of Det. Persson's testimony on this matter. After the two portions were read back to the jury, the trial justice then asked the jury whether those portions of Det. Persson's testimony satisfied its request, and the foreperson responded that they did not. The trial justice then added: "I didn't think it did. The witness testified that out of the six prints he could identify one. Does that help you? Am I getting close?" After the foreperson responded that the trial justice was "getting close" the trial justice called the attorneys to the bench for a sidebar conference. At this point defense counsel began to object, but the trial justice cut him off, saying: "Forget it. I didn't ask you anything yet." The trial justice then had the jury removed from the courtroom, and he and the attorneys listened to more of Det. Persson's testimony.

When the jury returned to the courtroom, the trial justice had more of the detective's testimony read back to the jury, and then the foreperson sought permission to ask a question, which the trial justice granted. The following colloquy occurred:

"MR. FOREPERSON: I think it's the word, 'identifiable' and/or 'unidentifiable'. Does identifiable mean that they have to have at least ten points to make it identifiable? And if it's unidentifiable does it mean they just don't have enough points or they don't have a person to match that print to?

"THE COURT: If you recall his testimony I think he did say how and what number of points are needed to identify a print. Therefore, the logical conclusion would be if there weren't enough points it's unidentifiable and—

"MR. FOREPERSON: And not because they didn't have a person to match it to?

"THE COURT: That was never offered in testimony so I don't know. Is that okay? Good luck to you, you're going to need it, I'll tell you that. You may retire."

The defendant compares the trial justice's statements to those of the trial justices in *State v. Wiley*, 567 A.2d 802 (R.I. 1989) and *State v. Dame*, 488 A.2d 418 (R.I.1985). In *Wiley*, the trial justice, in order to determine the amount of time the complainant had been "face to face" with her attacker, told the witness he would tell her to "start," and then when she thought the correct amount of time had passed, she was to yell "stop." *Wiley*, 567 A.2d at 803. At the end of this experiment, the trial justice estimated that fifteen seconds had elapsed. *Id.* The defendant objected to the trial justice's estimated time conclusion based upon the fact that the witness's testimony at no time indicated that she and the defendant were ever "face to face" and

the fact that he and the prosecutor both had disputed the trial justice's fifteen-second estimation of face to face observation of the defendant by the victim.

In sustaining the defendant's appeal in that case on the basis of the in-court experiment, this Court concluded that the experiment did not meet the basic requirement of similarity of conditions to the underlying event and that the trial justice had erred in refusing to strike his comments, despite both defense counsel and the prosecutor each disputing the trial justice's estimation of time. *Id.* at 804–05. Additionally, the length of time that the victim actually viewed her attacker's face in that case was a question of fact completely within the province of the jury, and the trial justice's comments "amounted to an invasion of that province." *Id.* at 805.

In *Dame*, when the jury during its deliberations requested assistance from the trial justice in that case about the expert witness's estimation of the time when a fire started, the trial justice, instead of reading back to the jury the recorded expert's testimony, simply summarized the testimony from her trial notes. *Dame*, 488 A.2d at 422. However, she only summarized from her notes regarding the witness's direct examination despite defense counsel's specific objection that the expert witness's testimony during cross-examination had contradicted his direct testimony and would support the defendant's position. *Id.* In overturning the defendant's conviction, this Court determined that "the importance of the testimony involved made the summary by the trial justice of only direct testimony inadequate and potentially misleading to the jurors." *Id.* at 423. This Court opined that the proper response to the jury's question should have been for the trial justice to read to the

jury those portions of the witness's direct and cross-examination testimony related to the subject matter of the question. *Id.*

■ In Junis Brown's appeal now before us, we note that after consulting with defense counsel and the prosecutor, the trial justice had the court stenographer read back to the trial jury portions of Det. Persson's trial testimony. When the jury foreperson followed the second read-back with a question, the trial justice answered: "If you recall his testimony I think he did say how and what number of points are needed to identify a print. Therefore, the logical conclusion would be if there weren't enough points it's unidentifiable and—." Detective Persson had testified on direct examination: "I lifted approximately six prints, one of them being identifiable. In other words, had enough points for identification." On cross-examination, defense counsel asked Det. Persson: "Of the other six you could not connect those to either Kip Stewart or to Marcelino Cepeda, the store owner, could you?" Det. Persson responded: "Yes, sir. They were unidentifiable." It appears that defense counsel's reference to the "other six" excluded the one print with sufficient points, and Det. Persson's response was accurate but misinterpreted.[4]

Detective Persson's testimony on cross-examination did not contradict his direct testimony, but was misinterpreted by the trial justice and defense counsel. Although the trial justice should not have ventured to further comment on Det. Persson's testimony, this Court has held that even if a trial justice's comment appears to have crossed the bounds of impartiality and, as in this case, was "unnecessary, unfortunate, and unduly suggestive of the trial justice's impression of the weight to

4. Since Det. Persson testified that he obtained six prints from the cigar boxes, we assume

that defense counsel meant to say the "other five" rather than the "other six" prints.

be afforded the testimony of defendant's key witness" it is not always sufficiently prejudicial to warrant a mistrial. *State v. Kryla*, 742 A.2d 1178, 1186 (R.I.1999).

In this case, we acknowledge also that defense counsel's initial attempt to object at sidebar was curtly cut off by the trial justice. While such conduct by a trial justice is not to be condoned, defense counsel failed to move to strike the trial justice's earlier comment and failed to move for a mistrial. Defense counsel did not offer any objections until after the colloquy between the trial justice and the jury foreperson had ended, and even then he did not object to any one statement, but to "anything more being said by the Court other than a reading of the testimony."[5]

■ We are nonetheless satisfied here that the trial justice properly addressed the concerns of the jurors by consulting with the attorneys, having the stenographer read back portions of the questioned testimony, and by attempting to respond to the jury's question with responses drawn directly from the expert's testimony. Unfortunately, he invited the jury foreperson in open court to initiate the colloquy that followed between the trial justice and the jury foreperson that should not have occurred in the presence of the jury. In situations such as this, a trial justice should always avoid commenting on the evidence and should always limit his or her response to the actual written question posed by a jury. If jurors do have further questions, the trial justice should send them back to the jury room to put their questions in writing, and the trial justice can then respond accordingly and avoid the danger of responding verbally to jury questions in a manner that could serve to jeopardize the trial process. Although we do not approve of the colloquy that occurred in this case, the trial justice's error was harmless beyond a reasonable doubt.

## II

### Trial Justice's Denial of Defendant's Requested Jury Instructions

The defendant next contends that the trial justice erred by failing to give the jury a fair and accurate statement of the law in his instructions to the jury by refusing to give the defendant's two specific requested jury instructions concerning the fingerprint evidence.[6]

■ In determining whether a trial justice properly instructed a jury, "this Court reviews a challenged instruction in the context of the entire charge to determine how a jury composed of ordinarily intelligent people would have understood the instructions as a whole." *State v. O'Brien*, 774 A.2d 89, 105 (R.I.2001) (citing *State v. Cipriano*, 430 A.2d 1258, 1262

---

5. We note that while defense counsel should have attempted to more fully articulate his objection, his aborted objection was sufficient to alert the trial justice. *See* Super.R.Crim.P. 51. We are also cognizant that defense counsel's failure to further attempt to articulate his objection was perhaps prompted by defense counsel's desire to not further test the trial justice's apparent impatience. The trial justice's rather premature and brisk, uncourtly cutting off of defense counsel's attempt to fully voice his objection is something, however, that should be avoided by trial justices in future cases.

6. The defendant requested the following jury instructions:

"Unless it can be shown that the circumstances are such that the fingerprint could have been impressed only at the time the crime was perpetrated, the presence of the defendant's fingerprint on the cigar box does not establish his connection with the crime charged.

"In order to find the defendant guilty the state must prove beyond a reasonable doubt that the fingerprint was placed there during the crime."

(R.I.1981)). A "trial justice's jury instructions will be upheld if 'they neither reduce nor shift the state's burden of proof.' " *State v. Carter,* 744 A.2d 839, 849 (R.I. 2000) (quoting *State v. Marini,* 638 A.2d 507, 517 (R.I.1994)). A "trial justice is free to instruct the jury in his or her own words, provided that he or she states the applicable law." *O'Brien,* 774 A.2d at 105 (quoting *State v. Parkhurst,* 706 A.2d 412, 418 (R.I.1998)). "[I]t is not reversible error for a trial justice to refuse to give instructions requested by a defendant, as long as the charge given adequately covers the law relating to the request." *Id.* (quoting *State v. Grundy,* 582 A.2d 1166, 1170 (R.I.1990)).

In this case, the trial justice gave the jury the following instructions regarding circumstantial evidence, robbery, and the standard of proof:

"Now, there is circumstantial evidence in this case. Circumstantial evidence is just as good as direct evidence. The law in this jurisdiction makes no distinction between circumstantial evidence and direct evidence. I told you at the start of this case that the state has the burden of proof. The state must prove the defendant must offer the evidence to prove the defendant guilty beyond a reasonable doubt. The defendant need not prove anything.

"Now, robbery is a crime involving intent. A person's intent or purpose or state of mind being subjective and a personal thing must be inferred from the person's actions or lack thereof. It is proper for you to determine in your own mind just what the defendant's state of mind or intent was on the day in question based on the facts you accept as true and the reasonable inferences that you draw therefrom.

"A reasonable doubt is a doubt founded on reason, not a doubt arising out of whimsy or caprice. Proof beyond a reasonable doubt exists, when, after you thoroughly and conscientiously considered and examined all the evidence that's presented before you, your mind is left in such a condition that you feel the correctness of the state's claim that the defendant is guilty of the charge.

"The United States Supreme Court in *Victor v. Nebraska* [, 511 U.S. 1, 27, 114 S.Ct. 1239, 1253, 127 L.Ed.2d 583, 603 (1994) ] put it another way, and I quote: 'Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world we know with absolute certainty and in criminal cases the law does not require proof that overcomes every possible doubt. If, based on your consideration of the evidence, you are firmly convinced the defendant is guilty of the crime charged you must find him guilty. If, on the other hand, you think there's a real possibility that he's not guilty you must give him the benefit of the doubt and find him not guilty.'

"Now, the charge in this case is robbery. A short form, robbery is the felonious and forcible taking from the person of another, goods or money of any value by violence or putting them in fear. Another way to say it is robbery is the unlawful or wrongful taking of money or goods of another of any value from the person of another or from his presence against his will by violence or by putting him in fear.

"The elements you must consider are: Unlawful or wrongful taking of money or goods from a person or from his presence against his or her will either by violence or putting one in fear. To deprive another wholly or permanently of his or her property."

These instructions properly explained to the jury the applicable legal principles consistent with the trial testimony, placed the burden of proof solely on the prosecution, properly defined the standard of proof, and clearly identified the elements of the crime with which the defendant was charged.

In denying the defendant's requested jury instructions, the trial justice properly noted that the case relied upon by the defendant for the language of those instructions, *State v. Moran*, 699 A.2d 20 (R.I.1997), materially differed from the instant case because *Moran* involved a fingerprint found on the outside of an automobile accessible to anyone. The trial justice pointed out that "[t]here is evidence in this case that no one other than the owner, his wife, and maybe his son would be behind the counter and have access to that cigar box." Also, unlike *Moran*, in which the fingerprint expert testified that he could not estimate how long the fingerprints were present on the vehicle and noted that such prints could last for several years, *id.* at 29, Cepeda testified that the cigar boxes at issue had been used only for about two weeks when the robbery occurred. Additionally, Det. Persson testified that fingerprints are fragile and that porous materials will absorb a fingerprint rather quickly. In this case, there was unchallenged testimony that the cigar boxes were kept behind the counter, on open shelves when filled with cigars, but on the floor under the cash register when the cigar boxes were empty and used to conceal and hold cash from store sales proceeds.

We consistently have held that a trial justice need only instruct the jury on relevant rules of law that must be applied to the issues raised at trial, and a requested instruction should not be given if it is unsupported by the trial evidence and it would tend to confuse and mislead the jury. *State v. Dellatore*, 761 A.2d 226, 231 (R.I.2000). We conclude that the trial justice's instructions to the jury were proper, and his refusal to give the jury the defendant's requested instructions was not error.

**III**

**Denial of Motion for Judgment of Acquittal**

The defendant argues that the evidence presented against him was not legally sufficient to sustain a conviction and that the trial justice erred in denying his motion for judgment of acquittal. The defendant claims that the unidentifiable prints on the cigar boxes undermine Cepeda's testimony that the cigar boxes were not accessible for handling by customers.

When reviewing the denial of a motion for judgment of acquittal, this Court applies the same standard as the trial justice. *State v. Clifton*, 777 A.2d 1272, 1276 (R.I.2001) (citing *State v. Mollicone*, 654 A.2d 311, 319 (R.I.1995)). "In ruling on this motion, the trial justice 'must view the evidence in the light most favorable to the state, without weighing the evidence or assessing the credibility of the witnesses, and must draw therefrom all reasonable inferences consistent with guilt.' " *Id.* at 1276 (quoting *State v. Evans*, 742 A.2d 715, 721 (R.I.1999)). "Viewing the evidence in this light, if the evidence could sustain a guilty verdict by the jury, the trial justice should deny the motion." *Id.* at 1276–77 (citing *State v. Mattatall*, 603 A.2d 1098, 1105 (R.I.1992)).

In this case, Cepeda testified that he kept the cigar boxes containing money on the floor behind the counter, where the customers were unable to see or have access to the boxes. During the robbery, the perpetrator opened one of the cigar

boxes, took the cash contained within it, and assaulted Cepeda. Detective Persson arrived at the scene shortly thereafter, and after processing the cigar boxes that were on the floor behind the counter, found a latent fingerprint matching the defendant's right middle finger, with twenty-two points of comparison.

Contrary to the defendant's assertion, this case is far different from *Moran* because the empty cigar box at issue here had been placed in a restricted area. The uncontradicted testimony at trial indicated that customers did not have access to the boxes whether they were filled with cigars or cash. Additionally, Cepeda testified that never had seen the defendant in his store before the incident, and that he always worked behind the counter, and although his wife occasionally worked behind the counter, she never was left in the store alone. Cepeda also testified that his son worked in the store at times but never behind the counter. In light of all of this evidence, the trial justice properly denied the defendant's motion for judgment of acquittal.

## IV

### Denial of Motion for a New Trial

Finally, the defendant claims that the trial justice erred in denying his motion for a new trial based on newly discovered evidence. The defendant asserts that certain witnesses with evidence discovered after the trial were able to refute significant parts of the prosecution's case.

 When ruling on a motion for a new trial, the trial justice must determine "whether the evidence adduced at trial is sufficient for the jury to conclude guilt beyond a reasonable doubt." *State v. Hornoff,* 760 A.2d 927, 933 (R.I.2000) (quoting *State v. Scurry,* 636 A.2d 719, 725 (R.I. 1994)). "When reviewing a motion for a

new trial this Court applies a deferential standard and will not disturb a trial justice's decision, unless he or she has overlooked or misconceived relevant evidence or was otherwise clearly wrong." *Id.* at 933 (citing *State v. Binns,* 732 A.2d 114, 117 (R.I.1999)). Additionally, a motion for a new trial based upon newly discovered evidence must satisfy a two-pronged test, and the defendant bears the burden of satisfying each prong. *Binns,* 732 A.2d at 118.

"The first prong is a four-part inquiry that requires that the evidence be (1) newly discovered since trial, (2) not discoverable prior to trial with the exercise of due diligence, (3) not merely cumulative or impeaching but rather material to the issue upon which it is admissible, (4) of the type which would probably change the verdict at trial. * * * Once this first prong is satisfied, the second prong calls for the hearing justice to determine if the evidence presented is 'credible enough to warrant a new trial.' " *State v. Firth,* 708 A.2d 526, 532 (R.I.1998) (quoting *State v. Hernandez,* 641 A.2d 62, 72 (R.I.1994)).

 At the hearing on the motion for a new trial, two ACI inmates, Shawn Isom and Jamal Bailey, testified that before they were incarcerated they had shopped at Cepeda's store and had seen a cigar box on the store counter. Isom testified that he had visited the store some three years before the robbery and had never seen cigar boxes on the shelves or floor behind the counter, but rather on the counter itself. Bailey also testified that he frequently had purchased cigars at Cepeda's store, which he would then hollow out and use to smoke marijuana. He testified that the cigars were kept in a box on the store counter, that he would pick out his own cigars, tell the man behind the counter, and leave him a dollar. He claimed to

have seen the defendant inside the store at some point in 1996. The defendant's girlfriend, Yolanda Harris, a.k.a. Yolanda Washington, a.k.a. Angela Grandy, also testified that she knew that the cigar boxes were kept on the counter, as did a third ACI inmate, Ernest Tucker, who had taken pictures of a friend holding a box of cigars in Cepeda's store. Roxann Beeman, the mother of the defendant's former girlfriend, also testified and showed pictures of the defendant's hair length in 1996.

The trial justice properly decided that none of this evidence constituted evidence that could not have been discovered before trial with due diligence. Ms. Harris, who claimed to have information about the location of the cigar box in the store, was present in the courtroom for the defendant's entire trial, as was the defendant, who chose not to testify at his trial but who testified at the hearing on his motion for a new trial.[7] Bailey testified that he knew the defendant from the neighborhood and had been in the store with him, and Tucker also knew the defendant from when they were younger.[8] Also, the defendant had actually lived with Ms. Beeman and her daughter near the time of the robbery. None of this information elicited at the hearing on the motion for a new trial could have been unknown to the defendant before trial and did not constitute newly discovered evidence. The trial justice properly denied the defendant's renewed motion for a new trial based on grounds of newly discovered evidence.

### Conclusion

For the reasons above stated, the defendant's appeal is denied and dismissed, and his judgment of conviction is affirmed. The papers of this case are remanded to the Superior Court.

---

7. The defendant testified at the hearing on the motion for a new trial: "I have a past record and if I took the stand at trial all that would have came in court." Defense counsel stated: "We could have brought his girlfriend in but I'm not going to put her on the stand; that's a tactical decision. She testified as an alibi witness before. I wasn't going to put Yolanda on the stand, that would have back-fired. Other than the people that would have been perceived as being friendly, those witnesses, I would suggest, aren't—they are not credible. I mean, because they're biased."

8. Tucker took a picture of his friend holding a box of cigars in Cepeda's store after purchasing the entire box of cigars.